UNITED STATES, Appellee,

v.

Sergeant William J. KREUTZER, Jr., United States Army, Appellant.

ARMY 9601044.

U.S. Army Court of Criminal Appeals.

11 March 2004.

For Appellant: Colonel Adele H. Odegard, JA (argued); Major Jonathan F. Potter, JA, USAR (argued); Captain Brian S. Heslin, JA (argued); Colonel John T. Phelps II, JA; Major Leslie A. Nepper, JA; Lieutenant Colonel E. Allen Chandler, Jr., JA; Captain Mary J. Bradley, JA; Captain Marc D.A. Cipriano, JA (on brief); Colonel. Robert D. Teetsel, JA; Major Imogene M. Jamison, JA; Captain Craig A. Harbaugh, JA.

For Appellee: Captain Karen J. Borgerding, JA (argued); Captain Steven D. Bryant, JA (argued); Captain Christopher G. Graveline; JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Eugene R. Milhizer, JA; Lieutenant Colonel Denise R. Lind, JA; Lieutenant Colonel Paul H. Turney, JA; Lieutenant Colonel Margaret B. Baines, JA; Major Patricia A. Ham, JA; Major Paul T. Cygnarowicz, JA; Captain Troy A. Smith, JA; Captain Jennifer A. Parker, JA (on brief); Colonel Russell S. Estey, JA; Lieutenant Colonel Lauren B. Leeker, JA; Major Anthony P. Niscastro, JA.

Before CHAPMAN, CLEVENGER, and CURRIE, Appellate Military Judges.

## OPINION OF THE COURT

CLEVENGER, Judge:

Pursuant to his pleas, appellant was convicted of a violation of a lawful general regulation and larceny of military property, in violation of Articles 92 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 921 [hereinafter UCMJ]. Contrary to his pleas, appellant was convicted by a general court-martial composed of officers and enlisted members of attempted premeditated murder (eighteen specifications), and premeditated murder, in violation of Articles 80 and 118, UCMJ, 10 U.S.C. §§ 880 and 918.[1] A unanimous twelve-member panel sentenced appellant to death, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the sentence as adjudged. This case is before the court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

## BACKGROUND

Early in the morning on 27 October 1995, appellant's brigade planned to conduct a unit run to mark their assumption of Division Ready Brigade duties in the 82d Airborne Division at Fort Bragg, North Carolina. As the troops moved out from their pre-run formation, appellant, hiding in a nearby wood line, opened fire on them, using two different rifles. Seventeen soldiers were wounded, and Major (MAJ) Stephen A. Badger was killed. Upon hearing the shooting and commotion, other soldiers exercising in the vicinity approached the area and came upon appellant in the act of shooting toward the brigade

---

1. Appellant plead guilty to the lesser included offense of murder while engaged in an act inherently dangerous to another, in violation of Article 118(3), UCMJ. He also plead guilty to the lesser included offense of aggravated assault with a loaded firearm, in violation of Article 128, UCMJ, as to Specifications 1–15, 17, and 18, of Charge I. Appellant provided a provident factual basis for his pleas of guilty. He plead not guilty to Specification 16 of Charge I, involving the wound inflicted upon Staff Sergeant Howes who was shot in the foot while trying to subdue appellant.

soldiers. They heroically tackled and subdued appellant.

Appellant assigns innumerable issues as errors in his case. Two merit discussion: (1) whether the military judge erred by denying appellant the services of an expert consultant in capital sentence mitigation, and (2) whether appellant's detailed trial defense counsel were ineffective in their representation of appellant at the sentencing stage of trial.

We unanimously agree that the sentence must be set aside due to ineffective assistance of counsel. Senior Judge Chapman agrees with me that the ineffective assistance of counsel did not prejudice the contested findings of premeditated murder and attempted premeditated murder. Judge Currie and I also find error in the military judge's denial of a requested expert mitigation specialist necessitating some relief. Therefore, a majority of the court sets aside the contested findings. We unanimously affirm the findings of guilty to the uncontested offenses.

Ordinarily, since a majority of the court finds reversible error in the military judge's ruling denying the defense the services of an expert mitigation specialist, we could conclude our analysis at that point. However, there are serious, additional considerations related to appellant's ineffective assistance of counsel claims stemming from the sentencing stage of trial. The two matters are inextricably linked. If the military judge had granted appellant's request for an expert mitigation specialist, perhaps his counsel, all of whom were totally inexperienced in capital litigation, might have been guided and assisted to a sufficient degree of professional competence in their efforts to present an adequate mitigation case. Alternatively, if appellant's counsel had demonstrated greater competence in their defense of appellant, then their efforts might have prevented the uncured prejudice at sentencing that the absence of an expert mitigation specialist produced. Thus, the erroneous ruling on the production of an expert mitigation specialist contributed directly to defense counsel's failings in the investigation, discovery, and analysis of the critical mental health and other mitigation issues in appellant's case.

## DENIAL OF DEFENSE REQUESTED EXPERT CONSULTANT IN CAPITAL MITIGATION

### Facts

After appellant was apprehended, the military police immediately took him to the local United States Army Criminal Investigation Command (CID) office. En route, he told them that "[i]t was God's way" and that God told him to do it. At the CID office, after waiving his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights, appellant asked to speak with Captain (CPT) Fong, a social worker who appellant identified as "his psychiatrist." Captain Fong was not available, as he was no longer assigned at Fort Bragg. Thus, appellant was offered a substitute psychiatrist, and he accepted that offer. Before the other psychiatrist arrived, however, appellant invoked his rights to remain silent and to consult with an attorney.

Shortly after that, CPT (Doctor) Diamond, the 82d Airborne Division psychiatrist, arrived at the CID office. Doctor (Dr.) Diamond informed appellant that any interview between them was not confidential and that he was not required to talk to her, but he elected to do so anyway. A CID agent and three prosecution lawyers monitored the interview, which lasted nearly an hour. Doctor Diamond opined that appellant's mood was severely distraught and that he was possibly delusional.

On 28 October 1995, while appellant was in pretrial confinement at Camp Lejeune, Lieutenant Commander (Dr.) Messer, a lawyer/psychologist, performed a suicide assessment on appellant. Doctor Messer concluded that there were "definite mental health issues" in appellant's case.

In November of 1995, appellant privately paid for an evaluation by a civilian forensic psychiatrist, Dr. Rollins. Doctor Rollins advised defense counsel that "an insanity defense would not be viable and that the attorneys should pour their main efforts into this case in mitigation." Appellant could not afford to continue to pay for Dr. Rollins' services.

From 6–8 December 1995, a sanity board, composed of officers from the local military hospital at Fort Bragg, evaluated appellant in accordance with Rule for Courts–Martial [hereinafter R.C.M.] 706. The board concluded that appellant was competent to stand trial and that appellant was not suffering from any severe mental disease or defect at the time of the offenses. At trial, appellant's detailed trial defense counsel called MAJ (Dr.) Diebold, a forensic psychiatrist and president of the sanity board, to testify for the defense.

Pursuant to a motion filed by the defense, a team of psychiatrists at the Walter Reed Army Medical Center evaluated appellant from 8—12 April 1996. The psychiatric team was working solely for the defense, and their work product was privileged. A team member, Colonel (COL)(Dr.) Brown, a reserve component Medical Corps officer, who was also a practicing civilian psychiatrist, signed a written report on 11 April 1996, after he had examined appellant. The report stated in part, "It is my professional opinion, based upon a reasonable degree of medical certainty, that: ... [appellant] is chronically and seriously mentally ill" and "[t]he crimes which he committed are causally related to his mental illness." The trial defense counsel never interviewed Dr. Brown nor learned of his written report and opinion before trial.

## Law

■ We review a military judge's ruling denying a request for expert assistance for an abuse of discretion. *United States v. McAllister*, 55 M.J. 270, 275 (C.A.A.F.2001); *United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F.2001). When the ruling involves a mixed question of fact and law, the fact-finding is tested under a clearly erroneous standard, and the conclusions of law are reviewed de novo. *United States v. Sullivan*, 42 M.J. 360, 363 (C.A.A.F.1995). Unfortunately, the military judge did not make any findings of fact. *See* R.C.M. 905(d). Consequently, we are only left to review his application of the law de novo. *United States v. Alameda*, 57 M.J. 190, 198 (C.A.A.F.2002). "We will reverse for an abuse of discretion if the military judge's ... decision is influenced by an erroneous view of the law." *Sullivan*, 42 M.J. at 363.

■ The Sixth Amendment grants an accused the right to compulsory process for ensuring the presence of necessary witnesses. U.S. Const. amend. VI. In *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court recognized that the Sixth Amendment right to counsel mandates the provision of adequate resources, to include experts, in order to present an effective defense. In the military, the right to supplement the defense team with expert assistance and witnesses is based on Article 46, UCMJ, 10 U.S.C. § 846, Military Rule of Evidence 706, and R.C.M. 703(d). A capital referral alone does not mean an accused requires or is entitled to expert assistance. *See United States v. Loving*, 41 M.J. 213, 250 (C.A.A.F.1994), *aff'd on other grounds*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("While use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required. What is required is a reasonable investigation and competent presentation of mitigation evidence."); *United States v. Garries*, 22 M.J. 288, 291 (C.M.A.1986) (declining to hold that a capital referral necessarily requires expert investigative assistance).

■ Our superior court has adopted a three-pronged test to determine whether expert assistance is necessary. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A.1994). The defense must show: (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the defense; and (3) why defense counsel are unable to gather and present the evidence that the expert assistance would be able to develop. *Id.; see United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F.1999); *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F.1999). Once an accused has satisfied this burden, the government must provide "competent" expert assistance. *Ake*, 470 U.S. at 83, 105 S.Ct. 1087; *United States v. Ndanyi*, 45 M.J. 315, 319 (C.A.A.F.1996); *United States v. Burnette*, 29 M.J. 473, 475 (C.M.A.1990).

## Discussion

■ Appellant's state of mind before, during, and immediately after the shooting was not only central to the case, but there was a wealth of relevant information available to discover, investigate, preserve, analyze, evaluate and potentially exploit at trial in defense of the premeditation allegations, and in mitigation. As revealed in appellant's post-shooting statement to the police, and to the certain knowledge of many soldiers in appellant's unit and chain of command, appellant had previously been treated by CPT Fong, an Army social worker, regarding the homicidal feelings appellant possessed and articulated towards fellow soldiers in the Sinai Desert while on a Multi-national Force and Observer (MFO) rotation in 1994. Doctor Diamond's notes reflected the observations and opinions of a trained psychiatrist seeing a patient in the immediate aftermath of an act of homicide. In her interview notes, she contemporaneously observed that appellant was "severely distraught" and "possibly delusional." Doctor Messer had the impression that there were "definite mental health issues in the case." Doctor Rollins indicated that mitigating mental health evidence concerning appellant would be central to any defense. Even one of the government lawyers who observed appellant's interview with Dr. Diamond noted, "*Conclusion:* Prepare for Insanity Defense! This guy is nutty [sic] than a fruit cake."

On 11 March 1996, defense counsel submitted a "Request for Authority to Employ a Mitigation Specialist in the case of *U.S. v. Kreutzer*, and Alternative Request for Funding of [Temporary Duty] TDY Costs Associated With Building a Case in Mitigation" to appellant's General Court–Martial Convening Authority (GCMCA). The GCMCA denied the request for the mitigation specialist, but authorized TDY funds to be expended to support defense counsel's necessary travel in order to prepare a defense in this capital litigation.[2]

On 26 March 1996, the defense moved for the appointment of an expert mitigation specialist by the military judge. The request, which was the same one previously submitted to the GCMCA, cited the relevant legal standard, explained the nature of a mitigation expert's function and purpose,[3] asserted defense counsel's own lack of experience and knowledge in the field, and stated the expected costs. *See* R.C.M. 703(d). In explaining the necessity for such assistance, the defense noted that it was to ensure that "all relevant information [be] brought before the panel."

Defense counsel properly defined "mitigation investigation" as "an inter-disciplinary, scientific analysis of the psycho-social history of an individual accused in a capital case." Such an expert mitigation specialist would "conduct more extensive interviews of [appellant], his family, and anyone else who may have relevant background information on him. Such an examination and analysis would discover the significant contributing events or factors in [appellant's] life that may have effected [sic] his mental health at the time of the offenses charged." It specifically asserted that "[d]efense counsel lack the experience and scientific expertise to uncover all potentially mitigating events or factors in [appellant's] case." The request also included an affidavit by Dr. Lee Norton (Norton affidavit), an expert in mitigation investigation,[4] which described the role of a mitigation specialist in specific detail.[5]

---

2. The GCMCA was obligated to provide such TDY funds under the terms of Army Reg. 27–10, Legal Services: Military Justice, para. 6–5*b* (8 Aug. 1994).

3. A useful, concise description of the role of a capital mitigation specialist may be found in Major Mary M. Foreman's article *Military Capital Litigation: Meeting the Heightened Standards of United States v. Curtis*, 174 Mil. L.Rev. 1, 27–31 (2002).

4. This is a classic military defense counsel dilemma. The best way to articulate and explain the

need for an expert is by using just such an expert to describe their evidence analysis and development process. But experts, when not already employed by the government, charge fees for their services, and detailed defense counsel normally do not have access to money to pay for such initial services, in order to obtain preliminary consultation or evaluation services.

5. The Norton affidavit was specifically related to a prior capital case, but it was intended to illustrate the broad, potentially significant role of a mitigation specialist in this death penalty case. It is clearly a compelling description of both the

The defense submissions adequately conveyed why they needed a mitigation specialist. The submissions fully described what the mitigation specialist would do to assist in the discovery and presentation of facts in evidence. Moreover, the Norton affidavit also highlighted the mitigation expert's role in finding "*all* records regarding the client ever generated" to include the "hard-to-find" documents. (Emphasis added).

When the motion came before the military judge for a hearing, the defense counsel told the judge that, while the defense team had begun to develop the mitigation case, the defense position was that the attorneys "by themselves [were] not completely qualified to do the work of a mitigation expert." Defense counsel specifically noted the potentially important roles of trained psychologists, psychiatrists and social workers in preparing the broad mitigation evidence relevant to any capital defense. Defense counsel also argued that "[t]o ask an attorney to compress and consolidate years of training into a few months is neighwell [sic] impossible." Without hearing from the prosecutor, but in line with the staff judge advocate's written advice to the convening authority recommending that the convening authority deny the request, the judge said, "I find the law here at *Loving 3* at 250.[6] I don't find the showing requiring me to order one."

Although the judge did not make any factual findings on the record (*see* R.C.M. 905(d)), there were several factors that he should have considered to determine whether an expert was needed. First, there were prima facie mental health issues known to the judge that might have established a defense of lack of mental responsibility, a lack of competency, or a partial lack of mental responsibility (*see, e.g.,* Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 6–5 (1 Apr. 2001); *but see* R.C.M. 916(k)(2)). Also, appellant's defense counsel had a fundamental need to present evidence to show that the extenuating and mitigating circumstances were not "substantially outweighed by the aggravating circumstance" alleged by the government. *See* R.C.M. 1004. The judge should have also carefully considered what defense counsel alleged that an expert mitigation specialist could accomplish for appellant at trial—discovery and analysis of appellant's psychosocial history by someone trained in the capital "mitigation specialist" role. Finally, in determining whether or not the defense counsel could adequately do the functions of an expert mitigation specialist, the judge should have considered, among other factors, defense counsel's lack of capital litigation experience, their minimal capital litigation training, their lack of scientific expertise, and the time constraints they were facing at trial.

The judge made a record of the three detailed defense counsels' Officer Record Briefs, but apparently did not consider them before ruling. None of that routine personnel data, which focused on their military service history and civilian education, provided any significant reason to think that they could replicate the role of an expert mitigation specialist. While the judge did ensure that the defense would have access to TDY funding to travel in support of their case preparation, the record also shows they did little traveling. Moreover, in traveling to interview the defense's appointed psychiatric experts at the Walter Reed Army Medical Center, they failed to discover, or learn by interview, the existence of Dr. Brown's written report on their client's mental status.

In *Garries,* our superior court recognized that "as a matter of military due process, servicemembers are entitled to … expert assistance when necessary for an adequate defense." *Garries,* 22 M.J. at 290. The court also noted that "[i]n the usual case, the investigative, medical, and other expert services available in the military are sufficient to permit the defense to adequately prepare for trial." 22 M.J. at 290–91. But appellant's trial was not the "usual case." The mitigation specialist's role would be to gather and

necessity for such an expert and the inability of defense counsel to successfully perform that role in this case. As noted above, appellant had a long and detailed psycho-social history that needed to be traced and evaluated.

6. *United States v. Loving,* 41 M.J. 213 (C.A.A.F. 1994).

collate appellant's civilian and military history with a particular view to the psychiatric issues that would help explain appellant's state of mind at the critical time of the shooting. One could speculate endlessly on what such an expert, if provided, would have done to help the detailed defense counsel assess the whole story of appellant's family stress, his homicidal ideation history in the Sinai, his past and current duty performance stress as an infantry soldier in the 82d Airborne Division and XVIIIth Airborne Corps, and the observations and conclusions of Dr. Diamond, Dr. Messer, Dr. Rollins, and CPT Fong. However, one single factor is most telling.

On appeal, appellant's appellate defense counsel requested the assistance of a mitigation specialist. This court granted the request and ordered the government to provide the necessary funding. To support that expert's evaluation process, appellate defense counsel also sought all relevant documents in the government's possession concerning appellant's mental health status, which led to the discovery of Dr. Brown's written report of 11 April 1996. Doctor Brown's opinion, "based upon a reasonable degree of medical certainty," was that appellant was "chronically and seriously mentally ill," his crimes were "causally related to his mental illness," and "[t]he impulse to commit these crimes could not have been resisted by" appellant. This potentially powerful, exculpatory mental status evidence was not discovered by, or known to the defense counsel, at the time of trial.

The judge's legal conclusion, "I don't find the showing requiring me to order one," in addition to being unsupported by any factual findings, also cites an unpersuasive legal rationale—"*Loving 3* at 250." In that case, the issue was whether or not defense counsel at trial erred by not seeking or using an expert mitigation specialist. In *Loving*, the defense counsel made a discrete and reasonably well-

analyzed tactical choice to avoid psychiatric evidence, but knew and considered what evidence was available. Defense counsel had a clear sentencing strategy and tailored the presentation of defense evidence to support that strategy. Thus, counsel did not err by declining to use an expert mitigation specialist. 41 M.J. at 250 ("defense counsel's investigation and presentation of defense mitigation evidence and their decision regarding use of expert testimony were reasonable."). The *Loving* court noted that the "use of an analysis prepared by an independent mitigation expert is often useful," but went on to say, "we decline to hold that such an expert is required." *Id.* This post-trial analysis about counsel's decision is not apposite here. Appellant's counsel were seeking an expert mitigation specialist before trial. They sufficiently explained why they needed the expert, what they expected a mitigation specialist to contribute, and why they should not be expected to successfully accomplish the same role.[7]

We hold that the judge abused his discretion in denying the defense motion for an expert consultant in capital mitigation in this case. This denial of due process is an error of constitutional magnitude and the test for prejudice is whether such an error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ In testing for harmless error we inquire "whether the error itself had substantial influence" on the trial results. *United States v. Pollard*, 38 M.J. 41, 52 (C.M.A.1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). If there was such a "substantial influence," or "if one is left in grave doubt, the conviction cannot stand." *Pollard*, 38 M.J. at 52. Here the judge's abuse of discretion adversely impacted the fairness of the trial on findings as to the issue of premeditation[8] by

---

7. Our dissenting brother finds the trial judge's reliance on *Loving*, 41 M.J. at 250, to be only for the proposition that there is not a per se requirement for a defense expert mitigation specialist in military capital cases and thus apposite. We abjure any intent to create such a per se rule. But the cited *Loving* authority does not address the trial judge's analysis of the defense request for an expert mitigation specialist. The trial

judge's inapposite reliance on the wrong law may have contributed to the error, but the error is in his conclusion, "I don't find the showing requiring me to order [an expert]."

8. A majority of the court agrees that the abuse of discretion substantially prejudiced appellant as to his ability to present an adequate case concerning his mental health status as it affected the

depriving appellant of a complete presentation of the evidence concerning his state of mind and, more significantly, on sentencing as to the presentation of mitigating circumstances that may have made the death penalty inappropriate in the minds of the court members. The government has not met its burden to persuade us to the contrary. *United States v. Pablo,* 53 M.J. 356, 359 (C.A.A.F.2000); *Pollard,* 38 M.J. at 52. The judge's error substantially prejudiced appellant by denying him the services of a mitigation specialist as an expert consultant and/or witness for the defense. The mental health issues involved, however, only significantly affect the narrow question of appellant's premeditated intent to kill and, of course, the overall impact of the evidence in mitigation. These issues are complex and extensive, and were well beyond the ken of appellant's counsel at that time. *Ake,* 470 U.S. 68, 105 S.Ct. 1087; *Garries,* 22 M.J. 288; *Gonzalez,* 39 M.J. 459. Accordingly, the contested findings involving premeditation and the sentence must be set aside.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Having determined that the contested findings and the sentence must be set aside, one other issue raised by appellant nonetheless merits discussion. Appellant's ineffective assistance of counsel allegations, as to both findings and sentence, are separate but necessarily related. A finding of guilty of premeditated murder in a capitally referred trial does not equate to a death sentence. The members' required unanimity on sentencing, their greater discretion on sentencing, the necessary specific findings as to aggravating or mitigating circumstances, and the wider range of relevant evidence on sentencing, all make the ineffective assistance of counsel

allegations surrounding sentencing more critical. We unanimously agree that appellant's detailed trial defense counsel did not provide effective assistance of counsel at the sentencing stage of this case.

### Facts

At trial appellant was defended by three detailed military defense counsel. None of them had ever participated in any capital litigation before and only one had any, however minimal, formal capital litigation training before being detailed to represent appellant. At trial, appellant entered pleas of guilty to the Article 92 and 121, UCMJ, offenses and to the lesser included offenses of aggravated assault with a loaded firearm in violation of Article 128, UCMJ, 10 U.S.C. § 928, and murder by an inherently dangerous act in violation of Article 118(3), UCMJ. In the defense opening statement, his counsel made it clear that appellant's state of mind at the time of the offenses was the focus of the defense case.

Following appellant's unanimous conviction of premeditated murder by shooting MAJ Badger, the government moved into evidence, over defense objection, a series of photographs showing the various wounds of some of the eighteen other soldiers he had also been convicted of attempting to murder. The government also admitted a large, framed photo of the Badger family, and MAJ Badger's Officer Record Brief. Staff Sergeant Sweeney testified that the Brigade added security detail duties to future Brigade formation runs after the 27 October 1995 shootings. On cross-examination, he said that he was unaware of anything the Brigade had done after the shootings to either encourage soldiers to refer themselves to appropriate treatment sources for mental

---

issue of premeditation in the contested findings of murder and attempted murder. Judge Currie would also grant similar relief for what he finds to be the prejudicially ineffective assistance of appellant's detailed trial defense counsel as to the contested issues in those findings. I specifically do not agree that the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), has been satisfied in that regard. Notwithstanding the powerful evidence that raises substantial concerns about the quality of appellant's mental health, there is

still substantial expert opinion evidence of his ability to premeditate and significant direct and circumstantial evidence of the actual processes of his alleged premeditation that fact-finders at trial could credit. As discussed below, I think those same fact-finders would or reasonably could have been differently swayed in the sentencing proceedings by the complete mental health evidence as it bears on the appropriate punishment for appellant and his most serious crimes.

health problems, or to alert a unit chain-of-command to identify and deal effectively with soldiers who may be suffering from significant mental health problems. Several wounded victims testified without being cross-examined by defense counsel: CW2 Castillo, who had been paralyzed from the chest down; SPC Bridges; SPC Molon; and MAJ Lofaro, who had been in a coma for forty-five days. Major Lofaro's wife, Penelope, also testified, and if anything, her testimony was more powerfully adverse to appellant than her husband's. Again there was no cross-examination. Finally, MAJ Badger's mother and wife testified, as well as LTC Kerrigan who had known MAJ Badger for at least eighteen months and worked closely with him in the Brigade, all without being cross-examined by the defense.

In their case-in-chief,[9] the defense counsel called a British Army exchange soldier, appellant's platoon sergeant, Color Sergeant Wakeland, to testify about appellant's nickname, "Crazy Kreutzer," and the overall stress level on the unit prior to 27 October 1995. Specialist Harlan, who had served with appellant since September 1993, testified in some detail about appellant's Sinai episode and how, the day before the Brigade run, appellant wanted to talk to CPT Fong, who had counseled him in the Sinai. Specialist Harlan had attempted to console and reassure appellant but appellant replied, "No, Harlan, it's not going to be alright." Also, in accordance with a stipulation of expected testimony, Sergeant Swartz of appellant's unit would testify that "[n]obody in the company respected [appellant] as an NCO, even the soldiers under him. Everybody thought he was odd, a loner, and funny in his ways. There was a lot of joking going on in the company concerning SGT Kreutzer."

Finally, Dr. Diebold was called by the defense as an expert in psychiatry and forensic psychiatry. He testified that the board diagnosed appellant as having an "adjustment disorder with mixed anxiety and depressed mood" and "dysthymia ... a chronic, lowgrade depression." They also found a "personality disorder not oth-

erwise specified" with a mixture of paranoid and narcissistic traits. The expert testified that the diagnosed condition was the product of "a long standing developmental pattern which starts very early in development ... in adolescence and can continue on for years." Doctor Diebold cogently explained the way these conditions might interact in a person and produce behavioral consequences. He specifically answered hypothetical questions based on facts pertinent to appellant's personal circumstances designed to show appellant's behavior was a consequence of his diagnosed mental health status. From a defense perspective, the expert's answers were hardly emphatic or compelling in suggesting that appellant's behavior on 27 October 1995 was anything other than a coolly calculated plan of revenge upon his unit. Moreover, Dr. Diebold, on cross-examination by the prosecution, pointed out that much of the psychiatric diagnosis was predicated on appellant's self-revelations to the board and that the board members felt appellant had been "skewing or shading a little bit" or "embellishing" certain self-reported symptoms. Doctor Diebold also agreed on cross-examination that appellant "was thinking clearly throughout all phases of this attack." Furthermore, he agreed that none of these personality or mood disorders "would have any effect at all in impairing [appellant's] ability to premeditate, plan, and execute the shooting that occurred on 27 October."

In the defense sentencing case, the panel members also received appellant's birth certificate and various photographs of appellant and his family, all leaving the impression of a normal, loving, caring, stable, family upbringing. They also received a routine, indeed standard, "good soldier" packet of awards, certificates, transcripts, and counseling statements about appellant. This packet included a certificate in which appellant's battalion commander, for his 1994 Sinai rotation, noted appellant's achievement for "meritorious service" and "superb performance of duty" as a "truly outstanding soldier" whose perform-

9. The court recognizes that in capital litigation the defense may reasonably seek to introduce

before the members as much of their mitigation evidence as early as possible in the trial.

ance was "in keeping with the highest tradition of the [MFO] and reflects great credit upon ... the 82d Airborne Division and the United States Army." This language, at a minimum, undermined the defense effort to paint appellant's actions in the Sinai as borderline psychotic, containing a prior threat to kill fellow soldiers while under personal stress, and requiring appellant to be relieved from duty as an armed observer at a platoon level-outpost as a mental health treatment option. The defense also admitted appellant's high school diploma.[10] Mr. Schriner, a retired Air Force Master Sergeant and long time neighbor of appellant in suburban Maryland during appellant's adolescence, testified about appellant as a child and the overall apparent normalcy of the Kreutzer family life.

Four defense stipulations of expected testimony were offered and admitted. Ms. Grouby, one of appellant's former high school teachers, and Ms. Witczak, appellant's former high school vice-principal, both would have described appellant as an "above average" student but otherwise unremarkable. Major Shipsey, an Air Force major and longtime family friend, who had played board war games with appellant and his sister, would have related the apparent normalcy of appellant and his family as well as appellant's early enthusiasm for, and later disenchantment with, military service. First Lieutenant Roseberry, appellant's platoon leader while he was deployed in the Sinai, would have testified that he did not believe appellant to be "socially well adjusted" and joked with other soldiers that appellant would be the "first to flip out." Finally, Sergeant First Class (SFC) Carnes, appellant's platoon sergeant while he was deployed in the Sinai, would have related how the joking from fellow soldiers "really began to affect [appellant]"; appellant related to SFC Carnes that he had homicidal tendencies toward members of his "Observation Post Team," after which SFC Carnes escorted appellant to visit CPT Fong.

10. Appellant's college degree from the University of Maryland was documented in the prosecu-

## Law

An ineffective assistance of counsel allegation on sentencing is a mixed question of fact and law. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F.2001). The ultimate determination of whether counsel were ineffective is a matter for de novo review. *Id.; United States v. Sittingbear*, 42 M.J. 750, 751 (Army Ct.Crim.App.1995).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-part, conjunctive test for evaluating ineffective assistance of counsel allegations. Appellant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052; *see also United States v. Scott*, 24 M.J. 186, 188 (C.M.A.1987). The first prong requires a showing that the defense counsel's efforts to defend against the imposition of a death sentence "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. This measurement of reasonableness must be based on all the facts and circumstances in the case. The prejudice prong requires a showing that counsel's deficient performance deprived appellant of a fair trial with a reliable result. *Id.* at 687, 104 S.Ct. 2052. Therefore, appellant must show that absent the deficient performance by counsel, "there is a reasonable probability that ... the result of the proceeding would have been different." *Id.* at 688, 104 S.Ct. 2052. A reasonable probability exists if the reviewing court concludes that the consequences of the counsel's deficient performance on the jury's determination to impose the death penalty was "sufficient to undermine confidence in the outcome [of the proceeding]." *Id.* at 694, 104 S.Ct. 2052. The Supreme Court further describes the test for prejudice by saying relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

tion's evidence.

■ Counsel are presumed competent, for purposes of evaluating claims of ineffective assistance of counsel. *United States v. Gibson*, 51 M.J. 198 (C.A.A.F.1999). In evaluating counsel's performance, an appellate court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Our inquiry must be "highly deferential" to the attorney's performance, avoid "the distorting effects of hindsight," and should employ "a strong presumption that counsel's conduct falls within the wide range" of professionally competent assistance. *Id.* at 689, 104 S.Ct. 2052. However, the Court recognized that merely invoking the word "strategy" to explain errors is insufficient since "particular decision[s] ... must be directly assessed for reasonableness in [light of] all the circumstances." *Id.* at 691, 104 S.Ct. 2052. As the Supreme Court stated in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052.

## Discussion

■ The President has mandated that in capital court-martial proceedings, upon a conviction for an offense qualifying for a death sentence, "[t]he accused shall be given broad latitude to present evidence in extenuation and mitigation." R.C.M. 1004(b)(3). This standard allows trial defense counsel a wide range of options regarding sentencing evidence. Concomitantly, it imposes a greater burden to discover, investigate, analyze, evaluate, and present extenuating and mitigating evidence on behalf of a client facing a capital sentence. Here, appellant's detailed trial defense counsel fell far short of that standard. *Wiggins v. Smith*, 539 U.S. 510, ————–——, 123 S.Ct. 2527, 2541–43, 156 L.Ed.2d 471 (2003); *see United States v. Murphy*, 50 M.J. 4, 14–15 (C.A.A.F.1998).

The defense counsels' sentencing case strategy merits little deference because they were not properly informed of all the necessary factual circumstances relating to mitigation. We note that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist [appellant] at sentencing." *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2541. Here, however, appellant's defense counsel failed to discover and investigate sufficiently the full range of available evidence, both psychiatric and other mitigation evidence, so that they could make reasonable choices and a comprehensive presentation. The psychiatric evidence failure is most notable. Appellant's counsel failed to discover that their own team of experts had a written opinion by an experienced psychiatrist, Dr. Brown, that was very favorable, albeit perhaps only as a preliminary medical conclusion, to their general theory of the case. The defense counsel did not call CPT Fong, the social worker who knew the most about appellant's Sinai episode, as a witness. They failed to summon Dr. Diamond, the 82d Airborne Division psychiatrist, who communicated with appellant immediately after the shooting. They never interviewed Dr. Messer, a psychologist/lawyer stationed at the pretrial confinement facility where appellant spent about 200 days before the trial. In short, the defense counsel failed in significant ways to discover and evaluate the full range of psychiatric evidence and expert opinion available to be used in mitigation. The consequences of this lack of knowledge were uninformed decisions such as calling Dr. Diebold as the sole defense expert as to appellant's mental health status and, as noted below, not cross-examining a key government sentencing witness.

The defense counsel's decision not to cross-examine many of the victims who testified, even if counsel had been fully prepared and aware of how the witness would likely respond, could be a reasonable tactic. But as to Mrs. Diane Badger, wife of the deceased victim, defense counsel's failure to even interview her before she testified at trial, in order to determine whether or not they should cross-examine her, was a tragic flaw. Mrs. Badger is apparently a woman of strong religious faith which gave her a powerful impetus to forgive appellant for his terrible act of killing her kind and loving husband. Regrettably, this evidence of her forgiveness,

which she clearly communicated to the prosecution, was not disclosed by the government to the defense counsel. *See* R.C.M. 701(a)(6)(C); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Regardless of the prosecutor's failing, defense counsel's failure to interview the principal victim, who would testify against their client about the devastating impact his killing of her husband had on her and their eight children, and to discover her extraordinary feelings of forgiveness and her belief that appellant should not be put to death, rendered their performance grossly ineffective on behalf of their client.

The jury sentenced appellant to death. They never knew the full and sincere depth of Mrs. Badger's forgiveness for the guilty evil-doer. They never heard the full range of psychiatric evidence about appellant from his adolescent history, to his time in the Sinai MFO rotation in 1994, through his pretrial psychiatric evaluation by an expert appointed to assist the defense. Their ignorance was a direct consequence of the defense counsel's failure to become fully informed of the available evidence, and not due to a tactical decision to not use possibly two-edged matters at trial. As horrific as appellant's crimes were, there was but a single death, and a substantial body of information to suggest appellant's disordered mental status may have affected his volitional acts. Prejudice to appellant exists due to the reasonable probability of a different result on sentencing.

Defense counsel's investigation into appellant's mental health background fell short of reasonable professional standards. *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2536. As in *Wiggins*, "[t]he mitigating evidence counsel failed to discover and present in this case [was] powerful." *Id.* at 2542. As a consequence of counsel's seriously deficient performance in representing appellant in the

sentencing phase of this court-martial, appellant was prejudiced in the imposition of the death penalty. *Williams v. Taylor*, 529 U.S. 362, 371, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The deficient performance here is quite sufficient to undermine our confidence in the sentencing outcome of this case.[11] It certainly creates a reasonable probability that the result would have been different on sentencing had competent counsel discovered and presented a complete sentencing mitigation case on behalf of appellant. *See United States v. Curtis*, 46 M.J. 129, 130 (C.A.A.F. 1997). Accordingly, even if we had found that the military judge did not err by denying appellant's request for an expert mitigation specialist, we would set aside the sentence on grounds of ineffective assistance of counsel.

## DECISION

Consistent with appellant's pleas, the court affirms only so much of the findings of guilty of Specifications 1–15, 17, and 18 of Charge I and Charge I as finds that appellant did assault with a loaded firearm the individuals named in Specifications 1–15, 17, and 18, in violation of Article 128, UCMJ, and of the Specification of Charge III and Charge III as finds that appellant did murder MAJ Stephen A. Badger while engaged in an act inherently dangerous to another. The court affirms the findings of guilty of the Specification of Charge II and Charge II and the Specification of Charge IV and Charge IV. The remaining findings of guilty and the sentence are set aside. The same or a different convening authority may order a rehearing on Specification 16 of Charge I as well as the set aside portions of Specifications 1–15, 17, and 18 of Charge I and Charge I, the Specification of Charge III and Charge III, and the sentence. If the convening authority determines that a rehearing on these find-

---

11. As to the merits portion of the case, the principal deficiency of failing to discover and effectively present a complete mental health picture of appellant goes directly to a defense of insanity (R.C.M. 916(k)(1)) or to a diminished capacity to form the requisite intent (*Ellis v. Jacob*, 26 M.J. 90 (C.M.A.1988); *United States v. Berri*, 33 M.J. 337 (C.M.A.1991); *but see* R.C.M. 916(k)(2)). To reiterate, even assuming the first prong of the

*Strickland* test for ineffective assistance of counsel were satisfied, I think there was not a reasonable probability that any showing of appellant's complete mental health status would have overcome the expert opinion evidence of sanity and the direct and circumstantial evidence of premeditation. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

ings is impracticable, he may dismiss those offenses to which appellant pled not guilty and order a rehearing on the sentence only.

CURRIE, Judge, concurring in the result.

I join in affirming the findings of guilty of all offenses to which appellant pled guilty. I write separately to express my opinion that appellant was denied effective assistance of counsel during the findings phase of his court-martial. On that basis, I would set aside the findings contrary to appellant's pleas and the sentence and authorize a rehearing. I also believe, as explained below, that the military judge erred by denying appellant's request for expert assistance.

To begin, I quote with complete agreement from Chief Judge Cox's concurring opinion in *United States v. Curtis*, 48 M.J. 331 (C.A.A.F.1997):

> Because there is broad discretion in the commander to seek the death penalty and because it only takes one court member's vote in either the findings or sentencing phase of a court-martial to defeat a death sentence, we quite naturally see a wide discrepancy in the imposition of the death penalty in courts-martial. Thus, I am now convinced that in order to ensure that those few military members sentenced to death have received a fair and impartial trial within the context of the death-penalty doctrine of the Supreme Court, we should expect that:
>
> 1. Each military servicemember has available a skilled, trained, and experienced attorney;
>
> 2. All the procedural safeguards prescribed by law and the Manual for Courts–Martial have been followed; and,
>
> 3. Each military member gets full and fair consideration of all pertinent evidence, not only as to findings but also as to sentence.

*Id.* at 332 (footnote omitted) (denying government's request for reconsideration); *see also United States v. Murphy*, 50 M.J. 4, 15 (C.A.A.F.1998).[1]

Appellant's trial can be summed up in one sentence: three defense counsel who lacked the ability and experience to defend this capital case were further hampered by the military judge's erroneous decision to deny them necessary expert assistance, thereby rendering the contested findings and the sentence unreliable.

## BACKGROUND

It is undisputed that on the morning of 27 October 1995 appellant shot and killed Major (MAJ) Stephen A. Badger and wounded eighteen of his fellow soldiers. Unknown to the court members, however, was the full extent of appellant's deteriorating mental stability before the attack.

### Appellant [2]

Appellant was born on 12 April 1969. His father was a police officer and his mother a homemaker. He has two older sisters and a younger brother. Both parents' families have a history of alcoholism and depression.

Appellant was a reserved and lonely child. He was a good student, but had difficulty making friends, participated in few extracurricular activities, and was a poor athlete. Appellant was sensitive to criticism, lacked self-confidence, and suffered feelings of inadequacy and low self-esteem. He developed symptoms of depression when he was about twelve-years-old. These feelings increased as appellant grew older.

The military, law enforcement, and firearms fascinated appellant from an early age. He spent much time reading about war and the military, playing war and fantasy games such as Dungeons and Dragons, and learning about and shooting firearms. These interests increased as appellant grew older.

1. *See generally* Major Mary M. Foreman, *Military Capital Litigation: Meeting the Heightened Standards of United States v. Curtis,* 174 Mil. L.Rev. 1 (2002).

2. The information in this section is drawn from the entire record of trial, including the allied papers, numerous sworn statements taken soon after the shooting from soldiers in appellant's unit, and appellate exhibits. *See Murphy,* 50 M.J. at 5–6 (Our superior court considered the record of trial and numerous post-trial affidavits as one of a "variety of procedures to ensure that a military accused's rights are fully protected.").

Appellant was unhappy in high school. He had few friends and was often lonely and depressed. Although attracted to girls, they were not interested in him. He felt "geeky." Without close friends and unable to discuss his problems with his parents, appellant confided in no one.

Appellant first seriously considered suicide when he was sixteen. Appellant, in a post-trial affidavit, said:

> On various occasions, I would retreat to my room, get a gun, load it and point it at myself. I would sit there, alone, with the gun at my head, immobilized. Each time, I was incapable of killing myself.... These episodes occurred at least ten times during my mid to late teens.

Appellant also cut himself numerous times as "expressions of severe depression."

In 1987, appellant graduated from high school in the top 5% of his class. He began college in the fall of 1987 and graduated in December 1991 with a degree in criminology. He lived at home during his college years. Since he commuted to school, he never felt part of the college community. He worked a few part-time jobs, but did not participate in extracurricular activities. He continued to have problems relating to women and did not have a girlfriend. Appellant's interest in guns increased—he collected firearms and increasingly devoted time reading about them and attending gun shows. He also continued to consider suicide.

During his first two years of college, JR, a cousin diagnosed as a paranoid schizophrenic, lived with appellant's family. JR's condition worsened to the point that the family feared for its safety, and JR was told to leave. At the same time, one of appellant's sisters was in a verbally and physically abusive relationship with a man. Her pain greatly angered appellant. On one occasion, appellant secured a gun intending to confront the man, but appellant's father stopped him. It was the first time appellant experienced "homicidal feelings."

In September 1991, one of appellant's few friends committed suicide by shooting himself in the head. Appellant enlisted in the Army that same month via the Delayed Entry Program. He entered active duty in February 1992 in the rank of Specialist (SPC) due to his college education. His primary military occupational specialty was 11B, Infantryman.

Following his initial entry training at Fort Benning, Georgia, appellant entered the Ranger Indoctrination Program, but failed the water survival course on the second day and quit. Appellant subsequently was assigned to the Long Range Surveillance Company in the XVIII Airborne Corps, Fort Bragg, North Carolina, where he served from August 1992 to March 1993. Some of his superiors thought he performed competently, but his introverted personality caused some morale problems within his unit. He was considered intelligent and highly knowledgeable about weapons, but some thought him a "nerd," a "geek," "strange," "odd," a "loner," and "introverted."

Even at this early point, appellant made frightening remarks. He told one soldier, "One of these days I am going to kill somebody." He told members of his unit that he planned to form a sniper team to kill the President. He also acutely felt the stress of being a soldier. During his last field problem with his team, appellant complained and cried about the difficulty of the exercise. According to one soldier, appellant "totally broke down" and had to be removed from the exercise.

Perceived as a failure, appellant was reassigned to A Company, 4th Battalion, 325th Airborne Infantry Regiment, 82d Airborne Division, Fort Bragg, North Carolina. In October 1993, he deployed with his unit to Jordan for three weeks without incident. In January 1994, he deployed to the Sinai Peninsula in Egypt for six months. Appellant's mental health deteriorated considerably during this time. His supervisors initially considered him an excellent duty performer who worked hard to help junior soldiers. However, despite his rank as a specialist, he was relatively inexperienced as a soldier. This fact, coupled with his strange personality, led to problems.

While in the Sinai, some of appellant's colleagues teased and played practical jokes on him. Angered by this ridicule, he fanta-

sized out loud about killing some of his squad members. In June 1994, appellant told another soldier in his platoon that he intended to get an automatic weapon and "hose down the enlisted barracks." He told other soldiers about killing his squad members during a unit formation. As a result, some soldiers thought appellant was crazy and referred to him as "Crazy Kreutzer," "Hannibal Lector," and "Psycho."

In June or July 1994, appellant broke down crying while on guard duty. When another soldier asked what was wrong, appellant went "into a rage and screamed[,] 'I'm going to kill them mother-fuckers, Harlan. I'm going to kill all those mother-fuckers.'" Appellant discussed his plans to kill members of his unit with one of his supervisors for over six hours. After hearing of appellant's comments and behavior, his platoon sergeant talked to him. Appellant told him that "he was so frustrated with the situation he had been thinking about shooting the members of his team." As a result, appellant was removed from his position, denied access to weapons, and escorted to the division mental health officer, Captain (CPT) Darren Fong.

Appellant talked to CPT Fong twice in the Sinai. Captain Fong reported in his notes, dated 13 July 1994, that appellant "has inappropriate coping mechanisms in dealing with his anger. This morning, [appellant] said that he wanted to kill his squad and he had plans using weapons and ammunitions." Captain Fong concluded that appellant had problems with anger and interpersonal relationships, poor coping skills, and low self-esteem, but that he was not a danger to others.

After the unit returned to Fort Bragg in August 1994, appellant met with CPT Fong. Appellant declined further counseling, and CPT Fong closed the case. Others, however, doubted appellant's mental stability. As one lieutenant put it, "After the Sinai incident, myself [sic] and other soldiers would joke that [appellant] would be the 'first to flip out.' Perhaps one day in the future we would see him in a McDonalds blowing people away."

Appellant returned to his platoon in August 1994. He attended the Primary Leadership Development Course in October 1994 and was elevated to acting squad leader the next month.

In early 1995, a childhood friend of one of appellant's sisters lodged a criminal complaint against appellant's father. The friend alleged that appellant's father had sexually assaulted her in 1982 when she was fifteen or sixteen-years-old. Appellant's father maintained his innocence, but the charges caused great stress for appellant and his family.

In March 1995, appellant was promoted to sergeant and assigned as the weapons squad leader. Appellant doubted his abilities as a leader and was concerned about the poor condition of his squad's weapons, which he believed reflected badly on him. At the same time, many of appellant's fellow noncommissioned officers (NCOs) and subordinates did not respect him. Some NCOs undermined appellant's authority by telling members of his squad not to listen to or obey him. Appellant's threats and obsession with weapons, war, and death led members of his unit to refer to him as "crazy," "Wild Bill," and "wacko." As a result, appellant became "more of a loner and distanced himself from everyone."

In June 1995, one of appellant's sisters was seriously injured in a water jet-skiing accident. Appellant was very concerned about his sister's recovery and her severe financial problems resulting from the accident.

In September and October 1995, appellant felt increasingly stressed. During a training exercise in late September, appellant was adversely counseled for his squad's inadequate operation of a machine gun. During the same exercise, appellant misplaced an M-60 machine gun barrel he had carried for an injured soldier. It was found twelve hours later, but only after disrupting the exercise. His company commander gave him a letter of reprimand. Appellant also felt pressured by the unit's preparations for an operational readiness survey and upcoming mission as part of the Division Readiness Force.

At the same time, appellant was given additional duties, including those of the company's lock-and-key NCO. Further, he was

told to prepare the decorations for a children's Halloween party sponsored by his unit, even though he felt unqualified to do so because he was single and had no children. He also heard that the unit might deploy to Bosnia and his winter leave would be cancelled. Appellant felt increasingly depressed, suicidal, and angry. He had difficulty sleeping. He continued to make threats to kill his superiors and fellow soldiers.

On 26 October 1995, the day before the shootings, appellant angered his first sergeant by failing a key inspection. He asked others to help him with the Halloween party scheduled for the next night, but believed that he was alone despite evidence that his entire squad was willing to assist. That same day, his squad failed a mandatory inspection because only one soldier had all the items in a required packing list. He considered the squad's failure his own.

Appellant decided to buy his soldiers' missing gear with his own money. He began to think about the meals his soldiers missed because of mission requirements and the equipment they sometimes had to purchase with their own funds. His perception that the Army did not care about its soldiers fueled his anger and frustration. While he purchased the gear, he thought of "shooting up the run the next morning" to make others "stand up and take notice ... that they weren't taking care of soldiers."

At around 1700 on 26 October 1995, appellant gathered weapons and ammunition for the next morning's attack, and spent the night at a motel instead of the barracks.

At 2010, appellant called SPC Mays, a member of his squad. He told SPC Mays not to buy anything for the Halloween party because there would be no party. He told SPC Mays that everyone was against him and that "he was left to put all these things together and no one would help him." He told SPC Mays that he was going to shoot the run the following day. When SPC Mays asked appellant to explain, he said that he was going to "mow everyone down." Specialist Mays thought appellant was joking, so he asked appellant how he was going to do it. Appellant responded that "he was going to

shoot everyone." The conversation ended when appellant told SPC Mays that he had to go and load magazines. Specialist Mays did not take appellant seriously because appellant had previously talked about killing people.

Appellant later said that although he was agitated and restless that night, he felt he was operating on "automatic pilot." He had two goals: (1) to send a message to the Army that the upper ranks did not care about the lower ranks and that he was an NCO willing to kill and die for his men, and (2) to be killed.

### The Shooting

In the darkness and fog of the early morning hours of 27 October 1995, appellant concealed himself in the wood line adjacent to Towle Stadium, located at Fort Bragg, North Carolina. Appellant was heavily armed with two semi-automatic assault rifles, two pistols, a knife, and nearly 900 rounds of ammunition, 630 of which had been loaded into magazines or the weapons. The 325th Airborne Infantry Regiment, also known as the 2d Brigade of the 82d Airborne Division, gathered in formation under the stadium's lights for a morning run.

At 0631, appellant methodically opened fire on his fellow soldiers. He wounded eighteen soldiers and killed one. One soldier was rendered a quadriplegic. Another soldier remained unconscious for forty-five days, during which time he was subjected to multiple surgeries and his mother died. Several soldiers were shot as they attempted to stop appellant. Major Badger was killed as he rushed towards the sound of fire to find and subdue appellant. During the attack, appellant screamed, "Fuck you bastards!" and "Take that!" The viciousness of appellant's attack was matched only by the heroism of appellant's intended targets.

During appellant's shooting spree, three Special Forces soldiers on a morning run—Sergeant First Class (SFC) Edward A. Mongold, Staff Sergeant (SSG) Robert R. Howes, and SSG Anthony M. Minor—heard shots. At great personal risk, they looked for the gunman. Sergeant First Class Mongold tackled appellant and SSG Minor jumped

into the fray to assist him. During the tussle, appellant continued to hold on to his rifle. As SSG Howes attempted to take it from appellant, he fired three times, hitting SSG Howes in the foot. Despite his wound, SSG Howes pulled the rifle from appellant. Appellant repeatedly urged his captors, "Kill me!" A few moments later, someone asked, "Why did you do this?" Appellant continued to struggle and screamed, "Because my unit was always fucking with me.... They're always fucking me[.] I wanted to fuck them back." He again asked to be killed. After the military police arrived and placed appellant in handcuffs, he angrily said, "Get these fucking handcuffs off me. I'll kill everyone."

A military policeman escorted appellant to the local office of the Criminal Investigative Command (CID). Along the way, appellant told the driver in a bland, flat voice, "It was God's way," and "God told me to do it." Appellant also asked, "How does it feel to catch a murderer? Have you ever murdered anybody?"

Appellant had parked his car nearby the shooting site. In it was a suicide note dated 21 October:

The bad dreams just won't end. I don't care where I go as long as its [sic] away from here. I'm a loser who just keeps on losing. I have nothing to look forward to. Fuck the world!

Suicide is the ultimate test of faith. It shows one is ready to risk all to see if his God will accept him. I love my parents, my sisters, my brother, and my closest friends, but I must leave them. I don't want to hurt them, but there is no other way.

AA Self–Storage—sell the contents of unit A–130 to pay for the funeral—sell my car too.

### After the Shooting

When appellant arrived at the CID office, he asked to speak to CPT Fong. He was unavailable so appellant agreed to speak to CPT (Dr.) Wendi Diamond, the 82d Airborne Division psychiatrist. Captain Diamond met with appellant at about 1030. In a post-trial affidavit, she said, "Never in my life had I ever seen someone in so much psychic distress," and that appellant "was not at all rational during our conversation."

Captain Diamond's case notes, written the same day she interviewed appellant, state, in part, the following:

[Appellant] stated that he attempted to get mental health phone support last Sat and Sun night [21 and 22 October 1995], since he did not feel comfortable seeing a therapist in person. He called the Womack [Army Hospital, Fort Bragg] psychology clinic, but "no one answered the phone." He called the Womack operator last night to ask if a psychologist was in-house but hung up the phone after being told, "no." He decided that, the next morning, he would either go AWOL, commit suicide, or commit mass homicide "to teach his unit a lesson." He wrote a suicide note, then called a buddy to tell him that he would not be at the next morning's PT. [Appellant] states that he told him he would kill his command, but his buddy did not believe him since it was said in a joking manner. He asked God to stop him if he was doing the wrong thing, and since God did not stop him, decided that killing soldiers was the right thing to do.

[Appellant] drove to the PT site at 0530, waited for people to arrive, and began shooting three of his personal weapons indiscriminately, with his mind "in another world." He stated that he was careful to avoid shooting his own squad, but thought that he was doing a favor to the soldiers he shot, since he was making them "free" of the military. He hoped he would be killed, but was instead tackled and brought to CID.

Captain Diamond described appellant, in part, as follows:

Speech was moderately pressured and loud, with normal rate. Mood was severely distraught. Affect was congruent, frequently tearful. Thought processes were linear. Thought content was significant for the statements that God has always disliked him, that the organization brainwashed him to be an assassin, and that the undersigned [CPT Diamond] could understand what he was now feeling by listening

to the songs, "Operation Mind Crime" by Queen's Reich and "Hallowed Be Thy Name" by Iron Maiden. He repeatedly yelled that his family would be devastated, and that he wanted to die. Perceptually, he denied auditory, visual, or tactile hallucinations, or ideas of reference. He demonstrated understanding that the interview was not confidential and that he could request to have a lawyer present.

Captain Diamond concluded that appellant's beliefs that "God wanted him to commit murder and that he was doing soldiers a favor by killing them are possibly delusional."

Appellant was placed in pretrial confinement, initially at the Camp Lejeune Naval Brig, North Carolina. Between the shooting and his trial, several psychiatrists and psychologists evaluated appellant:

1. 28 October 1995: Lieutenant Commander (LCDR) (Dr.) Drew Messer, a psychologist and lawyer stationed at Camp Lejeune, conducted a suicide assessment of appellant. In a post-trial affidavit, LCDR Messer stated that his "impression of [appellant's] condition was that he was profoundly depressed" and that "there were definite mental health issues in the case." On 3 November 1995, he faxed his suicide assessment report to one of appellant's attorneys. Defense counsel never contacted or interviewed LCDR Messer.

2. 11 November 1995: Dr. Bob Rollins, a forensic psychiatrist retained by appellant, interviewed him for several hours and reviewed material provided by appellant's defense counsel. His preliminary conclusion was that defense counsel should focus on appellant's "long-standing pattern of mal-

adaptive behavior and that this behavior pattern was known to the Army." In Dr. Rollins' view, the objectives were "treatment of [appellant's] depression and mitigation of sentence." Doctor Rollins was not retained to further assist appellant because neither appellant nor his family could afford to do so.

3. 16 January 1996: A sanity board, convened pursuant to Rule for Courts–Martial [hereinafter R.C.M.] 706, reported its findings. The board concluded, *inter alia*, that appellant "did not have a severe mental disease or defect" at the time of the offenses and "was able to appreciate the nature and quality or wrongfulness of his conduct" at the time of the offenses. The board also concluded that at the time of the offenses appellant suffered from an adjustment disorder with mixed anxiety and depressed mood,[3] a dysthymic disorder (early onset),[4] and a personality disorder[5] with narcissistic and paranoid traits.

4. 7–12 April 1996: The Forensic Psychiatry Program (FPP) at Walter Reed Army Medical Center (Walter Reed), Washington, D.C., evaluated appellant. The FPP was appointed to provide defense counsel expert assistance after the convening authority denied appellant funds to obtain a forensic psychiatrist of his choice.

On 11 April 1996, as part of the FPP's evaluation, Colonel (COL) (Dr.) Robert S. Brown, Sr., interviewed and evaluated appellant. Colonel Brown is a forensic psychiatrist in the U.S. Army Reserves who, at the time of the evaluation, was a consultant to the FPP. Colonel Brown concluded:

3. "The essential feature of an Adjustment Disorder is the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders [hereinafter DSM–IV], at 623 (4th ed.1994). Adjustment disorders are coded to the subtype that best characterizes the predominant symptoms. *Id.* "With mixed anxiety and depressed mood" is used when the predominant manifestations are symptoms such as "nervousness, worry, or jitteriness" (anxiety) and "depressed mood, tearfulness, or feelings of hopelessness" (depressed mood). *Id.* at 623–24.

4. "The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years...." DSM–IV at 345. "Early onset" means the symptoms occur before the age of twenty-one. *Id.* at 346.

5. A personality disorder is an "enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture." DSM–IV at 633. The enduring pattern is inflexible and pervasive, leads to clinically significant distress or impairment in important areas of functioning, and is stable and of long duration. *Id.*

It is my professional opinion, based upon a reasonable degree of medical certainty, that:

1. [Appellant] is chronically and seriously mentally ill.

2. The crimes which he committed are causally related to his mental illness.

3. The impulse to commit these crimes could not have been resisted by [appellant]. He knew that it was wrong to commit murder and to shoot others, however, the impulse to commit the crimes grew out of his decade of depression, suicide planning, and the perception that his last hope for living, to be a good squad leader, had been dashed: "I dint [sic] see my life ever working out. I was doubting myself as a squad leader. The only asset I had was caring enough for my squad to do something for them": to correct the wrongs he perceived that his squad had suffered at the hands of an "uncaring higher ranks."

4. He saw his squad as a projection of himself. In the deep recesses of his unconscious mind, he was, in a shocking series of unbroken feats, he was, [sic] by applying a mentally distorted formula, finally achieving approving recognition and acceptance, not unlike the worship a hero receives, for his damaged and flawed sense of himself, but he was also, according to his plan, ending the pain of living his life of depression, anxiety, anger, and despair which grew out of his distorted perceptions that he was no more than an ugly, ostracized and outcast weirdo.

5. He regrets what he did[;] however, the potential for future dangerousness is very great without intensive psychiatric intervention. His family [has] already observed significant improvement which is surely the result of the antidepressant Zoloft which was started recently. This must be viewed as [a] major contribution to a favorable prognosis, one that will likely be very good with the addition of psychotherapy which can only be provided in a psychiatric hospital.

The government has provided this court a post-trial affidavit from COL Brown. In his affidavit, COL Brown notes the preliminary nature of his diagnosis, that he was a consultant and not the lead forensic psychiatrist for the FPP on appellant's case, and that he did not conduct a comprehensive evaluation of appellant. However, COL Brown does not refute his diagnosis or his statement that his opinion was "based upon a reasonable degree of medical certainty."

At least two members of the FPP disagreed with COL Brown's opinion: Lieutenant Colonel (LTC)(Dr.) R. Gregory Lande, Director, Forensic Psychiatry Residency, Walter Reed, and Director, FPP, and MAJ (Dr.) Stephen J. Knorr, subsequently board-certified in forensic psychiatry in 1998. The substance of their disagreement is unknown as the FPP did not reduce its findings to writing. Instead, LTC Lande and MAJ Knorr orally reported their findings to defense counsel. One of appellant's defense counsel recalls that LTC Lande's findings "were not all favorable" to appellant.

Regarding COL Brown's diagnosis, MAJ Knorr stated in a post-trial affidavit, "I do not recall discussing Dr. Brown's report with him. I do remember looking at his report; I did not concur with his conclusions." Neither MAJ Knorr nor LTC Lande informed defense counsel of COL Brown's diagnosis. Therefore, defense counsel never interviewed COL Brown.

## THE COURT-MARTIAL

On 24 January 1996, the convening authority referred the charges to a general court-martial authorized to adjudge death. The aggravating factor authorizing a capital referral was that MAJ Badger's murder "was committed in such a way or under circumstances that the life of one or more persons other than the victim was unlawfully and substantially endangered." R.C.M. 1004(c)(4).

### Defense Counsel

Appellant was detailed three defense counsel: MAJ James C. Gibson, CPT James A. Martin, and CPT Stephen Stokes. Captain Martin was first detailed to the case since at the time of the offenses he was assigned to the Trial Defense Service (TDS) as a defense counsel with the XVIII Airborne Corps at Fort Bragg. Major Gibson was detailed to

the case in late November 1995. At the time, he was the Senior Defense Counsel at Fort Knox, Kentucky. Major Gibson was assigned to the case because, in his words, he "was one of the most experienced trial attorneys in the TDS Region, and also because [he] had attended a two-day course given at the Naval Justice School, in Newport, RI, on capital litigation, earlier in 1995." Captain Stokes was assigned to TDS with the 82d Airborne Division and detailed to the case after MAJ Gibson. All three defense counsel prepared post-trial affidavits describing their experiences and roles at trial, which this court admitted as defense appellate exhibits and are appended to this opinion.

As the affidavits state, MAJ Gibson and CPT Martin were appellant's primary defense counsel. Major Gibson was the most seasoned member of the defense team with several years of litigation experience. Captain Martin had been a trial counsel for a year and a defense counsel for six to eight months by October 1995. Neither had previously tried a capital case. Major Gibson's capital litigation training consisted of a two-day course. Captain Martin attended a capital litigation course after his detail to appellant's case.

Major Gibson noted that he and CPT Martin "did not explicitly divide trial duties pretrial. As a result, CPT Martin—who was stationed locally at Fort Bragg—dealt with a lot of issues as they came up, on an ad hoc basis." Moreover, several matters distracted MAJ Gibson from appellant's case, at least until March 1996:(1) his responsibilities as co-counsel in an extremely complicated case involving a judge advocate officer being tried at Fort Sam Houston, Texas; (2) his mother's terminal illness, culminating in her death in January 1996; and (3) his physical separation from Fort Bragg.

Both MAJ Gibson and CPT Martin recognized that they needed expert assistance regarding appellant's mental health issues and in preparing a case in mitigation. As a result, defense counsel asked for expert psychiatric assistance (and were assigned the

FPP) and a mitigation specialist (which was denied).

## The Trial on Findings

The trial on findings was straightforward. By his pleas of guilty, appellant admitted that he shot the victims (with the exception of SSG Howes) and that he murdered MAJ Badger by engaging in an act inherently dangerous to another.[6] In effect, the government was left to prove appellant's specific intent to kill with premeditation.

The government presented witnesses establishing that appellant was the shooter; that he had killed and wounded the victims; the severity of the victims' injuries; that when appellant was captured he made comments such as those reported above; that he had previously threatened to kill his squad members, senior NCOs, and others, both in the Sinai and at Fort Bragg; and that a few NCOs had undermined appellant's authority and other soldiers had ridiculed appellant, thereby upsetting him.

The defense consisted of three witnesses: Color Sergeant David Wakeland, a British soldier serving as appellant's platoon sergeant; SPC Robert Harlan, one of appellant's few friends; and MAJ (Dr.) Carrol Diebold, the president of appellant's R.C.M. 706 sanity board. Color Sergeant Wakeland testified that appellant was a slightly above average NCO; appellant's nickname was "Crazy Kreutzer"; the unit was under stress; and appellant had been given a few additional duties. Specialist Harlan testified that he and appellant were roommates in 1993, but that he had not seen appellant often between July 1994 and October 1995; during their time in the Sinai, other troops ridiculed appellant; appellant once became so upset by this behavior that he cried and threatened to kill everyone at the site; the day before the attack, appellant was visibly upset and wanted to see CPT Fong; and appellant snapped because he could not handle the stress.

Major Diebold testified consistent with the sanity board's conclusions. He said it was "possible" that appellant would react impul-

---

6. As noted in the lead opinion, appellant also pled guilty to violating a lawful general regulation (wrongfully transporting loaded firearms) and larceny (stealing ammunition and pyrotechnics), in violation of Articles 92 and 121, UCMJ.

sively to stress. On cross-examination, MAJ Diebold said that appellant's statements were an important part of the sanity board's diagnosis; appellant was aware that his statements could be used against him; appellant could have misled the sanity board; appellant could have been exaggerating his disorders; appellant's personality disorders are "moderate"; and, in his opinion, at the time of the attack, appellant could premeditate, knew what he was doing, knew right from wrong, thought clearly throughout all phases of the attack, and was rational and methodical.

On closing, the government argued appellant was a "cold-blooded killer." The defense argued appellant's acts were a "cry for help" and an attempt to commit suicide, rather than a premeditated design to kill. The twelve-member panel was out for two hours before returning findings of guilty as charged.

## I

### INEFFECTIVE ASSISTANCE OF COUNSEL ON FINDINGS

Appellant asserts he was prejudiced by his counsels' deficient performance. In particular, he claims that defense counsel did not adequately investigate his case, did not properly use the expert assistance provided them, and did not develop a coherent and logical trial strategy. I agree.

### Standard of Review

We review de novo claims that counsel were ineffective and appellant was prejudiced. *United States v. Key*, 57 M.J. 246, 249 (C.A.A.F.2002); *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F.2001).

As our superior court has observed:

In order to evaluate properly appellant's multiple claims, it is first necessary for us to put the case into perspective. Thus, we must carefully review every aspect of the case and balance the claims against the total record before us. That review includes consideration of the training, experience, and abilities of trial defense counsel; the pretrial proceedings; the investigative efforts of the defense team; the selection of the court members; the

trial strategy; the performance of counsel during the trial; the sentencing case; and the post[-]trial proceedings.

*Murphy*, 50 M.J. at 8. In exercising our responsibilities, this court, like our superior court, has "the benefit of having reviewed numerous cases over the years and developed a sense of the standards of performance that can reasonably be expected of defense counsel." *Id.* Our duty is to:

ensure that fundamental notions of due process, full and fair hearings, competent counsel, and above all, a "reliable result," are part of the equation. In the final analysis, we have heretofore examined, and shall continue to examine, the record of trial in capital cases to satisfy ourselves that the military member has received a fair trial.

*Id.* at 15.

### Law

The Sixth Amendment guarantees that an accused shall have the "Assistance of Counsel for his defence." U.S. Const. amend. VI. Article 27, UCMJ, 10 U.S.C. § 827, requires that an accused be detailed defense counsel when tried by a general or special court-martial. Counsel's assistance must be effective. *United States v. Russell*, 48 M.J. 139, 140 (C.A.A.F.1998); *see Mickens v. Taylor*, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a capital case, established a two-pronged, conjunctive test for ineffective assistance of counsel claims: (1) was counsel's performance deficient, and (2) did such performance prejudice the defense? To establish deficient performance, appellant must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. To establish prejudice, an appellant must show that but for his counsel's deficient performance "there is a reasonable probability that ... the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

Regarding counsel's performance, an appellate court "must judge the reasonableness

of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Our inquiry should be "highly deferential[ ]" to defense counsel's performance, avoid "the distorting effects of hindsight," and employ "a strong presumption that counsel's conduct falls within the wide range" of professionally competent assistance. *Id.* at 689, 104 S.Ct. 2052. However, deference is not abdication and must not be used to insulate counsel's performance from meaningful scrutiny. Representing an accused murderer in a capital case is a unique responsibility for a defense counsel, and the "seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance." *Proffitt v. Wainwright,* 685 F.2d 1227, 1247 (11th Cir.1982). Moreover, merely invoking the word "strategy" to explain errors is insufficient since "particular decision[s] ... must be directly assessed for reasonableness in [light of] all the circumstances[.]" *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

Regarding prejudice, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is not whether we are certain the result would be different; rather, it is whether we find the probability of a different result "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also United States v. Burt,* 56 M.J. 261, 264 (C.A.A.F.2002); *Murphy,* 50 M.J. at 8; *United States v. Polk,* 32 M.J. 150, 153 (C.M.A.1991).

## Deficient Performance

At the outset, I note that appellant's defense counsel were not unqualified merely because none had previously tried a capital case. Lack of capital litigation experience does not per se render counsel unqualified or ineffective in a capital case. Our superior court repeatedly has rejected calls that it set minimum standards for defense counsel in capital cases based on years of practice or number of cases tried. *See, e.g., United States v. Gray,* 51 M.J. 1, 54 (C.A.A.F.1999);

*United States v. Loving,* 41 M.J. 213, 300 (C.A.A.F.1994); *see also United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). As our superior court did in *Murphy,* I have "look[ed] to the adequacy of counsels' performance, rather than viewing the limited experience of counsel as an inherent deficiency." 50 M.J. at 10.

### Failure to Adequately Investigate

It is well-settled that " 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Wiggins v. Smith,* 539 U.S. 510, ——, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). Counsel's responsibility to investigate includes interviewing witnesses that may be of value to the case. *United States v. Alves,* 53 M.J. 286, 289 (C.A.A.F.2000). In this case, appellant's defense counsel did not interview several critical witnesses. As defense counsels' post-trial affidavits make clear, the failure to interview these witnesses was not a conscious, tactical decision; it was the result of incompetence. This failure rendered defense counsels' performance deficient and significantly contributed to their inability to develop and implement a logical strategy to defend appellant.

In particular, defense counsel never interviewed CPT Diamond, the 82d Airborne Division psychiatrist who talked with appellant for about an hour within the immediate aftermath of the shooting. Her initial impression was that appellant was "possibly delusional." In a post-trial affidavit, CPT Diamond stated, "It must be understood that the physical and mental stresses at the 82nd were extreme. If a soldier were a little different or had trouble fitting in or keeping up, he would be harassed by other soldiers." Regarding appellant, she said:

9. Never in my life had I ever seen someone in so much psychic distress. [Appellant] was absolutely distraught, virtually inconsolable.

. . . .

10. [Appellant] was not at all rational during our conversation. His belief that his actions in shooting up a PT formation would solve what he perceived to be prob-

lems at Fort Bragg shows that he was not thinking rationally. Also, [appellant's] conclusion—expressed to me during the conversation—that if God did not want this to happen He would intervene, is evidence of [appellant's] irrationality and disordered thoughts.

11. Following my encounter with [appellant] that day I was never contacted either by government officials or by defense counsel. I was surprised by this, because I believed that both sides could have benefited from my assessment of [appellant's] mental state very close to the time of the offenses.

Captain Martin stated, "I remember discussing Dr. Diamond with MAJ Gibson, and it is my recollection that MAJ Gibson was responsible for interviewing her." Captain Martin also says he did not listen to an audiotape of the interview. Major Gibson stated he "assumed that [CPT Martin] would conduct the interview [with CPT Diamond], as he was local at Fort Bragg." In a nutshell, each thought the other was responsible for talking to CPT Diamond and that the other had done so. This assumption is inexplicable because appellant's counsel apparently never discussed CPT Diamond's possible testimony or whether she should be called as a witness.

Other potential witnesses were not interviewed because of similar communication breakdowns. For example, CPT Martin thought MAJ Gibson had interviewed CPT Fong, the social worker who had treated appellant in the Sinai. As a result, CPT Martin did not interview CPT Fong and believed "that he was not called as a witness because we did not think his testimony regarding [appellant] would be mitigating." Major Gibson said he did not interview CPT Fong because he thought "CPT Martin had spoken with him by phone."

Defense counsel also did not interview LCDR Messer, the Camp Lejeune brig psychologist who conducted a suicide assessment of appellant the day after the shooting. Lieutenant Commander Messer concluded that appellant was "profoundly depressed" and recommended that a psychiatrist evaluate appellant for appropriate medication. In a post-trial affidavit, he said he faxed a copy of his report to one of appellant's defense counsel, but never heard from him. He was surprised because of his belief that there were "definite mental health issues in the case."

### Failure to Properly Use Experts Provided to the Defense

As noted above, the FPP was made available to defense counsel to assist them in preparing for trial. Defense counsel stated they needed expert assistance to "conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing cross[-]examination of a government psychiatric witness." *See generally* R.C.M. 703(d).

Defense counsel were on the right track. As one commentator has noted:

The expert can assist defense counsel by interpreting data, suggesting fertile areas for attacking the government's case, preparing counsel to cross-examine witnesses effectively, testifying for the defense, investigating aspects of the case, serving as a sounding board to test defense theories, determining whether appropriate tests have been conducted and, if necessary, conducting additional tests.

Major Will A. Gunn, *Supplementing the Defense Team: A Primer in Requesting and Obtaining Expert Assistance,* 39 A.F. L.Rev. 143, 143–44 (1996) (footnote omitted); *see United States v. Turner,* 28 M.J. 487, 488–89 (C.M.A.1989). A psychiatrist's or psychotherapist's role on the defense team is to conduct an appropriate examination of the accused and assist defense counsel in the identification, evaluation, preparation, and presentation of evidence in defense or mitigation regarding an accused's mental status. *See, e.g., Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

However, defense counsel did not use the FPP as intended. Most notable is the fact that LTC Lande and MAJ Knorr did not tell defense counsel about COL Brown's diagnosis of appellant. Both MAJ Gibson and CPT Martin have unequivocally stated that they first heard of COL Brown's diagnosis when

appellate defense counsel informed them of it in February 2002. Major Knorr admitted, "I do not know whether Dr. Brown had any contact with defense counsel. I also do not know for sure whether the attorneys knew that Dr. Brown had examined their client. I am virtually certain that Dr. Brown's report was not provided to the defense counsel."

In effect, this failure deprived the defense of an experienced forensic psychiatrist's diagnosis that appellant was "chronically and seriously mentally ill" and that the "crimes he committed are causally related to his mental illness." As CPT Martin put it,

> Had I known of Dr. Brown's examination, I would certainly have discussed his conclusions with him, to determine whether Dr. Brown would be an effective witness for the defense at [appellant's] trial, either at the findings stage or in extenuation and mitigation. At a minimum, Dr. Brown's report would have been helpful to the defense team in developing a strategy for trial, whether or not we ultimately called him as a witness. I do not know why Dr. Brown's examination was not discussed with me or why his report was not provided to me. It was my understanding that the [FPP] at [Walter Reed] had been appointed to assist the defense in this case and [appellant] was sent to [Walter Reed] in April 1996 to be evaluated by the doctors there in preparation for trial. MAJ Gibson and I met with Drs. Lande and Knorr, in April 1996, to discuss their evaluation of [appellant], and they did not mention Dr. Brown or his findings to us at all. I also may have had a couple of telephone conversations with Dr. Knorr.

Moreover, my reading of the record, including the post-trial affidavits of defense counsel and MAJ Knorr, leads me to conclude that the FPP did little more than give defense counsel a second opinion of appellant's mental health at the time of the offenses and pending trial. Communications between defense counsel and LTC Lande and MAJ Knorr were sparse. Major Gibson and CPT Martin met once with MAJ Knorr and LTC Lande to discuss appellant. Captain Martin and MAJ Knorr spoke telephonically a few times. More importantly, as CPT Martin said, "I do not remember that Drs. Lande and Knorr adequately explained to me how their findings could assist in presenting a mitigation case." He also stated, "I do not remember if we asked them to assist in developing mitigation information, nor do I remember if they volunteered any." The record also indicates that LTC Lande and MAJ Knorr did not interview CPT Diamond or MAJ Diebold or attend the trial. Major Knorr is uncertain whether he interviewed CPT Fong during or after the FPP's evaluation of appellant.

It was defense counsels' responsibility to properly and fully use its experts. If defense counsel had informed MAJ Knorr and LTC Lande of their proper role to assist the defense, it is difficult to imagine that they would not have shared COL Brown's diagnosis with them, even if they disagreed with it. Defense counsel should have ensured that MAJ Knorr or LTC Lande talked to CPT Diamond and CPT Fong and discussed with them whether they would have been helpful witnesses. Also, it is doubtful defense counsel would have called MAJ Diebold if they had thoroughly discussed MAJ Diebold's likely testimony. Defense counsels' failure was deficient performance.

### Failure to Develop a Trial Strategy on Findings

Defense counsel recognized they faced an uphill battle. The evidence that appellant shot many of his fellow soldiers was indisputable. To add to their difficulties, defense counsel also were unaware of COL Brown's diagnosis and had been denied a mitigation specialist, as discussed below. They also had not interviewed CPT Diamond, LCDR Messer, or CPT Fong, and failed to properly use the FPP. As a result, defense counsel—after reviewing the R.C.M. 706 sanity board's evaluation and talking to Dr. Rollins, LTC Lande, and MAJ Knorr—rejected appellant's only possible affirmative defense: that he lacked mental responsibility for his actions at the time of the offenses. R.C.M. 916(k)(1). The only strategy remaining was to create a reasonable doubt that appellant lacked the mental capacity to formulate the specific intent to kill with premeditation. *See Ellis v. Jacob*, 26 M.J. 90 (C.M.A.1988) (discussing

the defense of diminished capacity and R.C.M. 916(k)(2)); *see also United States v. Hoskins,* 36 M.J. 343 (C.M.A.1993); *United States v. Berri,* 33 M.J. 337, 344 (C.M.A. 1991).

However, counsel did not develop or implement such a strategy. First, their failure to interview critical witnesses and effectively use their assigned experts deprived them of the information they needed to formulate an effective trial strategy. Second, they believed that the court members, all from Fort Bragg, would not be sympathetic to the "use [of appellant's] mental health problems as an excuse" for the attack. In CPT Martin's words:

> The peculiar culture at Fort Bragg was a tremendous influence in this case. The pervasive atmosphere at Fort Bragg was that soldiers with mental health problems should not seek mental health services. Soldiers with mental health problems need to "suck it up and drive on" and failure due to mental health falls into the area of "no excuses." This patent lack of sympathy and empathy, fostered at all levels of command, was particularly influential in steering us away from an insanity or diminished capacity defense. I honestly did not think that emotional or mental health problems would be accepted as mitigating by the court-martial panel.

Regardless of the validity of these perceptions, MAJ Gibson concluded that, as a result, he and CPT Martin essentially "failed to develop a coherent theory of the case." Captain Martin said "their thought was to rest on 'honor, to show remorse and responsibility.'" This approach effectively amounted to no strategy during the findings phase of the trial, as the trial itself illustrates.

In the end, only one expert witness on appellant's mental health testified during the trial. Defense counsel called, on findings, MAJ Diebold even after he told defense counsel that if asked he would express his belief that appellant "was able to premeditate his actions." Major Gibson explained, "We were aware that [MAJ Diebold] was reluctant to testify but felt that we had to put some mental health evidence on." Major Diebold's testimony, however, essentially proved the government's case.

### Prejudice

Even though his counsels' performance was deficient, appellant must establish that he was prejudiced. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Testing for prejudice, we must review both the findings consistent with and contrary to appellant's pleas. With regard to the findings consistent with appellant's pleas, appellant must show specifically that "there is a reasonable probability that, but for counsel[s'] errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *see Alves,* 53 M.J. at 289. With regard to the findings contrary to appellant's pleas, appellant must show that, but for counsels' deficient performance, "there is a reasonable probability that ... the result of the proceeding would have been different[,]" thus rendering the result unreliable. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

I would affirm the findings consistent with appellant's pleas. The military judge conducted a thorough inquiry into appellant's pleas in accordance with *United States v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969). Appellant's responses, made under oath, were consistent with his pleas and supported by the entire record. Appellant has not provided this court with any evidence that the affirmative defense of lack of mental responsibility would have been available to him or any other matter that would have influenced him to plead not guilty if counsels' performance had not been deficient. *See Alves,* 53 M.J. at 289–90. Thus, there is no reasonable probability that appellant would have insisted on going to trial but for his counsels' errors. *See Hill,* 474 U.S. at 59, 106 S.Ct. 366; *Alves,* 53 M.J. at 289.

The findings contrary to appellant's pleas are a different matter. Appellant's not guilty pleas required that the government prove that appellant had the specific intent to kill with premeditation. Appellant would remain eligible for the death penalty only if the members unanimously found appellant guilty of premeditated murder. R.C.M. 1004(a)(2). Appellant has presented us evidence that his

defense counsel could have used to create reasonable doubt in the mind of at least one member regarding his capacity to formulate such an intent. The cumulative effect of defense counsels' failures to adequately investigate, to effectively use their assigned experts, to develop and implement a realistic trial strategy to create reasonable doubt, and to present any mental health evidence other than the devastating testimony of MAJ Diebold effectively resulted in a concession of "guilty as charged." *See Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th Cir.2002) (finding trial defense counsel's failure to develop and consider information about accused murderer's fragile and failing mental health—information directly related to defendant's capacity to premeditate—rendered conviction of premeditated murder unreliable). The findings contrary to appellant's pleas are unreliable, and they and the sentence should be set aside.

## II

## MITIGATION SPECIALIST

The military judge erred by denying appellant the services of a mitigation specialist. In my opinion, this error, coupled with defense counsels' ineffectiveness, prejudiced appellant in regard to those findings contrary to his pleas.

### Standard of Review

We review a military judge's ruling on a request for expert assistance for an abuse of discretion. *United States v. McAllister*, 55 M.J. 270, 275 (C.A.A.F.2001); *United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F.2001); *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F.1999); *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F.1999); *United States v. Houser*, 36 M.J. 392, 397 (C.M.A.1993) (declining to set aside a military judge's decision unless it forms a "definite and firm conviction that the court below committed a clear error of judgment").

### Law

The Supreme Court, in *Ake*, 470 U.S. at 77, 105 S.Ct. 1087, recognized that the Due Process Clause of the Constitution requires that a criminal defendant be provided expert assistance when such assistance is necessary for a fair trial. This principle, likewise, applies to the military. UCMJ art. 46; R.C.M. 703(d); *United States v. Garries*, 22 M.J. 288, 290 (C.M.A.1986) (expert assistance is a matter of military due process when necessary for a fair trial).

Our superior court has adopted a three-pronged test to establish whether an accused is entitled to expert assistance. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994). The defense must show: (1) why the expert is needed; (2) what the expert would accomplish for the defense; and (3) why defense counsel is unable to gather and present the evidence that the expert assistance would develop. *Id.; see also Ford*, 51 M.J. at 455; *Short*, 50 M.J. at 373. An accused must demonstrate to the trial court that there is a reasonable probability that an expert would be of assistance and that denial of expert assistance would result in a fundamentally unfair trial. *Gunkle*, 55 M.J. at 31–32 (citations omitted). Once an accused has satisfied this burden, the government must provide "competent" expert assistance. *United States v. Ndanyi*, 45 M.J. 315, 319 (C.A.A.F. 1996).

Capital referral alone does not mean an accused requires or is entitled to expert assistance. *Gray*, 51 M.J. at 1. "While use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required. What is required is a reasonable investigation and competent presentation of mitigation evidence." *Loving*, 41 M.J. at 250; *see also Garries*, 22 M.J. at 290 (refusing to hold that a capital referral necessarily requires the expert assistance of an investigator). However, military judges should consider counsels' experience when determining whether expert assistance is necessary. This is particularly true in capital cases. *See generally* Dwight H. Sullivan, et al., *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 Geo. Mason U. Civ. Rts. L.J. 199 (2002); Major David D. Velloney, *Balancing the Scales of Justice: Expanding Access to Mitigation Specialists in Military Death Penalty Cases*, 170 Mil. L.Rev. 1 (2001).

### Test for Prejudice

As the right to expert assistance is based on an accused's constitutional right to due process, as well as military due process based on Article 46, UCMJ, deprivation of those rights is an error of constitutional magnitude. Our superior court has stated that the test for prejudice when expert assistance has been wrongly denied is "whether the court-martial's findings of guilty were 'substantially swayed by the error.'" *McAllister*, 55 M.J. at 276 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). *But see Ake*, 470 U.S. at 86–87, 105 S.Ct. 1087 (reversing and remanding case for a new trial because denial of expert assistance deprived defendant of due process; no test for prejudice stated); *United States v. Crews*, 781 F.2d 826, 834 (10th Cir.1986) (requiring reversal and a new trial where expert assistance wrongfully withheld was indispensable to a fair trial). Therefore, I am bound to apply the *Kotteakos* test for prejudice. *See United States v. Allbery*, 44 M.J. 226, 227–28 (C.A.A.F.1996).

### Discussion

Defense counsel satisfied all three prongs of *Gonzalez*. Therefore, the military judge abused his discretion by denying appellant necessary expert assistance.

#### *Necessity*

Lacking any capital litigation experience, defense counsel recognized early why they needed the assistance of a mitigation specialist and that they were not qualified to perform this function. As MAJ Gibson stated,

> From my limited knowledge about capital cases at the time [of appellant's court-martial], I did understand that it was important for the defense to put on a case in mitigation, and that employing a mitigation expert was one of the most effective ways of preparing a mitigation case. I did not know at the time how crucial such assistance is in capital cases.

Captain Martin said that after "meeting [appellant] and walking the crime scene, [he] immediately recognized that [he] needed expert assistance in preparing a mitigation in-vestigation, in anticipation of putting on a mitigation case at trial."

On 11 March 1996, CPT Martin requested that the convening authority appoint a mitigation specialist to "assist the defense as an expert in the area of mitigation investigation." In pertinent part, the request said:

> 2. [Appellant] requires the services of a mitigation specialist. Mitigation investigation is an inter-disciplinary, scientific analysis of the psycho-social history of an individual accused in a capital case. Specialists in this area can conduct more extensive interviews of [appellant], his family, and anyone else who may have relevant background information on him. Such an examination and analysis would discover the significant contributing events or factors in [appellant's] life that may have effected [sic] his mental health at the time of the offenses charged. Recent capital cases have approved of such mitigation experts.
>
> 3. Defense counsel lack the experience and scientific expertise to uncover all potentially mitigating events or factors in [appellant's] case. It is therefore necessary to enlist the assistance of such an expert to insure [appellant] receives a fair trial with all relevant information brought before the panel.

Captain Martin attached to the request a fourteen-page affidavit from Dr. Lee Norton, a mitigation specialist who had worked on approximately forty-five capital cases. The affidavit described in detail the expert assistance that a mitigation specialist would have provided appellant's inexperienced defense counsel.

On the advice of his SJA, the convening authority denied the request on 22 March 1996, but provided defense counsel funds so they could investigate appellant's mitigation case. At trial, defense counsel filed a motion requesting that the military judge order funds be provided for a mitigation specialist. Citing *Loving*, 41 M.J. at 250, the military judge simply held that "I don't find the showing requiring me to order one." He made no findings of fact.[7]

---

7. It is unclear what the military judge meant by his reference to *Loving*. In *Loving*, a capital

Senior Judge Chapman notes that Dr. Norton had prepared his affidavit for a different case. He also observes that the affidavit "described how a mitigation specialist could retrieve records, conduct interviews, analyze documents, interpret data, and organize findings," implying mitigation specialists do no more. Senior Judge Chapman's central point appears to be that, while appellant "argues that his trial defense team lacked the experience and expertise needed to perform those tasks," appellant has not explained why his defense counsel, the FPP, and a military police investigator could not have achieved substantially "the same results as a mitigation specialist."

I disagree with this assessment of defense counsels' request. Doctor Norton's affidavit states that mitigation specialists have "special skill and experience that the attorneys and other experts generally do not" (1) to obtain, analyze, organize, and summarize huge amounts of information about an accused and his family that cuts across many disciplines, including medicine, psychology, forensics, and law enforcement; (2) to identify the "inherited impairments and patterns of dysfunction" of an accused's life that reveal the "cumulative effect of such influences"; and (3) to assist counsel in determining the best way to explain to the court an accused's impairments and their effects on him. Doctor Norton's affidavit describes the critical role mitigation specialists fulfill in capital cases and defense counsels' inability to perform those functions. While I agree with my dissenting brother that it is defense counsels' responsibility to present mitigation evidence on behalf of an accused, an accused and his counsel are entitled to expert assistance when necessary in order to effectively meet those responsibilities.

The question of whether the military judge abused his discretion must be placed in context. The military judge knew this was a capital case and that capital cases in the Army are extremely rare. He reviewed defense counsels' officer record briefs and knew or should have known that the litigation experience of two of the three defense counsel was limited. He knew that none of appellant's defense counsel had previously tried a capital case. When the military judge made his ruling, he was familiar with the basic facts of this case. He knew appellant indiscriminately shot up a brigade run on 27 October 1995, wounding many and killing one. He knew the comments appellant made upon and immediately after his capture. As an experienced jurist, he knew that appellant's mental state at the time of the shooting would present the primary issue on findings. All this was relevant to whether defense counsel needed the requested expert assistance.

Defense counsel established why they needed the expert assistance (appellant's mental health at the time of the offenses was the singular issue on findings); what the expert would accomplish (discover, analyze, and develop evidence of the significant contributing factors that affected appellant's mental health at the time of the offenses); and why defense counsel could not perform this task (no training or expertise). *See Gonzalez*, 39 M.J. at 461. Defense counsel established the necessity for expert assistance. The military judge abused his discretion by denying appellant such assistance. *See Gunkle*, 55 M.J. at 32.

### Prejudice

On appeal, this court ordered that funds be provided to appellant to retain a mitigation specialist. Appellate defense counsel provided us the interim report. The mitigation specialist reviewed all previous mental health assessments of appellant. She exhaustively

murder case, defense counsel decided not to present expert mitigation testimony as a tactical choice because they were concerned that the expert would reveal his opinion about Loving's sociopathic personality on cross-examination. 41 M.J. at 250. Our superior court concluded that defense counsel's decision to not present expert mitigation testimony was reasonable. *Id.* On appeal, Loving contended that "mitigation experts are essential for capital murder cases,"

to which the court responded, "While use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required." *Id.* The relevance of this holding to appellant's case is limited. Regardless, I assume that the military judge knew and correctly applied the law and have, accordingly, reviewed his ruling for an abuse of discretion. *See Gunkle*, 55 M.J. at 32.

described appellant's family history, the development of his mental health problems, and the circumstances leading to the offenses. She concluded, in pertinent part, that appellant: (1) suffered from chronic depression with features of anxiety; (2) has an avoidant personality disorder; and (3) at the time of the offenses, experienced an adjustment disorder, the essential feature of which is "the development of clinically significant emotional or behavioral symptoms in response to identifiable psychological stressors or stressors." In appellant's case, the mitigation specialist explained that the stressors included the sexual assault charge lodged against his father, his sister's accident, the constant ridicule of peers and subordinates, the overwhelming demands of appellant by the military, and his failures as an NCO and soldier.

The government is correct that the reports of the mitigation specialist and the R.C.M. 706 sanity board do not differ significantly in their descriptions of appellant's life. It does not follow, however, that appellant was not prejudiced. A mitigation specialist would have brought more to this defense team than just the results of her investigation. She would have provided these inexperienced counsel an "inter-disciplinary, scientific analysis" of appellant's "psycho-social history" and of the events leading to the offenses. She almost certainly would have found and interviewed critical witnesses, such as CPT Diamond and COL Brown, and evaluated their potential contributions to the defense case. A mitigation specialist would have ensured that the defense team fully and appropriately used all experts assigned to it. She would have assisted in the formulation of an effective trial strategy based on all the evidence, both on the findings and the sentence. She would have helped defense counsel effectively present appellant's case and attack the government's. The mitigation specialist would have helped defense counsel explain to the members why a law-abiding soldier sud-

denly turned into a murderer. In sum, the military judge's error depriving these defense counsel this expert assistance, coupled with counsels' ineffectiveness, "substantially swayed" the findings.

While I recognize that the law does not require a mitigation specialist in every military capital case, the law does require that every military accused be provided effective assistance of counsel. In capital cases defended by counsel of limited, if any, capital litigation experience, it is prudent that staff judge advocates, convening authorities, and military judges provide the defense team the expert assistance it needs to effectively defend the accused, and thereby render the results of trial reliable. That did not happen in this case.

## CONCLUSION

As our superior court said in *Murphy*, in the "final analysis, we have heretofore examined, and shall continue to examine, the record of trial in capital cases to satisfy ourselves that the military member has received a fair trial." 50 M.J. at 15. I do not believe this appellant received a fair trial, and, therefore, agree we should set aside the findings inconsistent with appellant's pleas and the sentence and authorize a rehearing.

CHAPMAN, Senior Judge, concurring in part and dissenting in part.

I agree with the majority that appellant's trial defense counsel were ineffective in their representation of appellant at the sentencing stage of appellant's court-martial. I concur with their conclusion that there exists a "reasonable probability" that appellant's sentence would have been different but for counsels' deficient performance. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1]

1. I respectfully disagree with that portion of Judge Currie's concurring opinion where he concludes that prejudicial ineffective assistance of counsel rendered the findings unreliable. I agree with Judge Clevenger that the prejudice prong of *Strickland* has not been satisfied. Notwithstanding counsel's deficiencies, there is more than enough direct and circumstantial evi-

dence of premeditation and expert opinion evidence as to appellant's sanity to convince me that a more complete picture of appellant's mental health would not have resulted in a different finding. *Id.* at 688, 104 S.Ct. 2052; *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

I must disagree, however, with the majority's conclusion that the military judge erred by denying the defense request for a mitigation specialist. In my opinion, the defense did not sufficiently explain the need for such a specialist.

We review a military judge's decision on requests for expert assistance for abuse of discretion. *United States v. Ford,* 51 M.J. 445, 455 (C.A.A.F.1999); *United States v. Short,* 50 M.J. 370, 373 (C.A.A.F.1999). The accused has the burden to demonstrate a necessity for an expert's services. *United States v. Garries,* 22 M.J. 288, 291 (C.M.A. 1986); *see also Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). An accused is not · automatically entitled to a mitigation specialist in every capital case. *See United States v. Loving,* 41 M.J. 213, 250 (C.A.A.F.1994); *Garries,* 22 M.J. at 291. Our superior court has adopted a three-pronged test to determine when an expert's assistance is necessary:

> First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop.

*Ford,* 51 M.J. at 455 (quoting *United States v. Gonzalez,* 39 M.J. 459, 461, *cert. denied,* 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994)).

An accused must demonstrate more than a mere possibility that an expert is necessary for counsel to present an adequate defense. *United States v. Robinson,* 39 M.J. 88, 89 (C.M.A.1994). An accused must show "that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Moore v. Kemp,* 809 F.2d 702, 712 (11th

Cir.1987), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). *See United States v. Gunkle,* 55 M.J. 26, 31–32 (C.A.A.F.2001); *Kelly,* 39 M.J. at 237–38. Defense counsel must establish a "nexis between the facts and circumstances of [an accused's] case and the need for a [mitigation specialist]." *United States v. Warner,* 59 M.J. 573, 579 (A.F.Ct.Crim.App.2003).

Here I find that the defense counsel did not make the requisite showing of necessity for a mitigation specialist.[2] The defense request for a mitigation specialist consisted of a one-page memorandum where counsel explained that the defense needed the services of such an expert to conduct interviews that may reveal "significant contributing events or factors in SGT Kreutzer's life that may have effected [sic] his mental health at the time of the offenses charged." (R. at Appellate Exhibit 51). Attached to this generic request was a copy of an affidavit made by a mitigation specialist in a wholly, unrelated case. That affidavit generally described the role of a mitigation specialist, to include how a mitigation specialist could retrieve records, conduct interviews, analyze documents, interpret data, and organize findings. Although appellant argues that his trial defense team lacked the experience and expertise needed to perform those tasks, appellant has not explained to my satisfaction why three judge advocates, a military police investigator, and the Walter Reed Forensic Psychiatry Program, could not substantially achieve the same results as a mitigation specialist. "Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case." *United States v. Kelly,* 39 M.J. 235, 238 (C.M.A. 1994); *Short,* 50 M.J. at 373. Furthermore, the "[p]resentation of mitigation evidence is

---

2. Judge Clevenger wrongly concludes, in my opinion, that the military judge "cites an unpersuasive legal rationale" in denying the request. *United States v. Kreutzer,* 59 M.J. 773, at 779 (Army Ct.Crim.App.2004). The military judge cites *United States v. Loving,* 41 M.J. 213 (C.A.A.F.1994), at page 250 in making his decision. Judge Clevenger accurately points out that the issue in *Loving* was not whether the military judge abused his discretion in denying a request for expert assistance, but rather was the defense

counsel's decision not to utilize an expert reasonable. Thus, according to Judge Clevenger, the military judge's reliance on *Loving* is misplaced. I believe, however, that the military judge cited *Loving* only for the proposition that "[w]hile use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required." *Id.* at 250. The military judge then rightly concluded that there had been no showing of necessity.

primarily the responsibility of counsel, not expert witnesses." *Loving*, 41 M.J. at 250.

In appellant's case, I see no showing that the services of a mitigation expert would have affected the reliability of the adjudged findings. I would require a greater showing of necessity than what counsel presented at trial. Thus, I would hold that the military judge did not abuse his discretion in denying appellant's request for a mitigation specialist.

Accordingly, I would affirm all of the findings, set aside the sentence, and authorize a rehearing on the sentence by the same or different convening authority.

### APPENDIX

- Affidavit of Major Gibson
- Affidavit of Captain Martin
- Affidavit of Captain Stokes

### AFFIDAVIT

The Affiant, James C. Gibson, Jr., after first being duly sworn, makes the following statement:

I was one of the attorneys who represented SGT William J. Kreutzer, Jr., at his general court-martial on capital charges at Fort Bragg, North Carolina. The offenses occurred in October 1995. I believe that I was detailed to the case in late November, 1995. At the time I was detailed to the Kreutzer case, I was assigned as the Senior Defense Counsel at Fort Knox, Kentucky. I believe I was assigned to the Kreutzer case because I was one of the most experienced trial attorneys in the TDS Region, and also because I had attended a two-day course given at the Naval Justice School, in Newport, RI, on capital litigation, earlier in 1995. At the time, this two-day course was the extent of my knowledge or training about handling capital cases.

I am currently a public defender in the Capital Trial Branch, Department of Public Advocacy, Frankfort, Kentucky. My office, absent unique circumstances, is assigned only to cases in which the death penalty is being sought. I have been with this office since 1997. During this period, I have been sent to four separate specialized training courses in defending death penalty cases. In addition, I have access to an extensive capital defense library, including capital trial manuals from numerous states. In my current capacity, I have personally worked on between 20 and 30 cases in which the death penalty was being sought. I have been defense counsel in four trials that resulted in death sentences.

Based on the experience and training I have obtained in capital case representation since I left active duty, I now seriously question whether I was professionally prepared to try SGT Kreutzer's case. Although we did not realize it at the time, I believe none of us on the defense team—neither CPT Tony Martin nor CPT Steve Stokes nor me—had the professional training or experience necessary to try a capital case, nor were we provided with the resources or the time to prepare a meaningful defense. This lack of training and experience quite possibly resulted in Sergeant Kreutzer being sentenced to death.

I feel that my representation of SGT Kreutzer was hindered by the fact that I was not stationed at Fort Bragg, where the offenses took place and where the convening authority was. Between the time I was assigned to the case, in late 1995, and the date of the trial, in June 1996, I spent no more than three weeks at Fort Bragg. I first went to North Carolina in late November, 1995. This was about a month after the offenses, and SGT Kreutzer was confined at the Camp Lejeune brig. During the pretrial phase of the trial, in early 1996, I was co-counsel in an extremely complex contested case at Fort Sam Houston, Texas, which involved a mental responsibility defense and in which the accused was a judge advocate officer. This other case had been ongoing for more than a year. I was tied up with the preparation and trial of that case from the beginning of 1996 until the first of March (sentence was announced on 29 February 1996). As a consequence, I was unable to give undivided attention to SGT Kreutzer's case. During this time, motions in SGT Kreutzer's case were being filed, issues arose, hearings were held, and I was more

than 1000 miles away, deeply immersed in an unrelated trial.

CPT Martin and I did not explicitly divide trial duties pre-trial. As a result, CPT Martin—who was stationed locally at Fort Bragg—dealt with a lot of issues as they came up, on an ad hoc basis. I do recall that we agreed that CPT Martin would take the lead in issues involving contact with and interviews of SGT Kreutzer's family. I now believe this led to a number of instances of lack of communication and a situation in which we failed to develop a coherent theory of the case.

Additionally, throughout the winter of 1995–96, my mother was terminally ill with cancer. We moved her into my home where, with the assistance of a local Hospice organization, we could care for her at the end. She died on January 23, 1996. Her last few months were very difficult, and there was significant stress from the emotional and physical difficulties of caring for her. Almost immediately after her death, I went to Texas for the Fort Sam Houston case, returning only after the verdict had been rendered in that case.

Because of the distance, I was unable to communicate with co-counsel in the Kreutzer case, CPT Martin, as much as I would have liked. He was assigned to TDS at Fort Bragg, and he had been detailed to SGT Kreutzer's case immediately after the offenses occurred. I relied on CPT Martin to do a lot of the groundwork in preparation for trial, but we probably did not speak to each other as much as we should have. As a result, our trial preparation probably suffered and was not as thorough as it could have been. Specifically, there were witnesses who probably should have been interviewed who were never interviewed by any of SGT Kreutzer's defense counsel (CPT Wendi Diamond, the 82d Airborne Division psychiatrist, and CPT Darren Fong, the medical service corps social worker who assessed SGT Kreutzer in the Sinai, are examples). CPT Stokes, who was also at Fort Bragg (in TDS with the 82nd Airborne) came into the case late. He made the opening statement at trial and also assisted us in other ways, but he did not play a major role in case preparation.

As the case developed, I became very concerned about the large number of R.C.M. 802 (off record) sessions with the military judge. I also felt that I was being rushed to trial, and that more time was needed to prepare for trial. I got the strong impression that the judge was determined to try the case before he was reassigned in summer 1996 and that he would not have tolerated a delay. I discussed these concerns with CPT Martin, who told me that that was the way the way the judge, COL Brownback, always ran his court, referring to the extensive 802 sessions. I remember mentioning my concern about the 802 sessions with the judge, probably informally or in an 802 session, and he responded that was the way he liked to do things to ensure there were no surprises when we were in the courtroom. In retrospect, I should have formally objected to the large number of substantive issues that were discussed in 802s, and I probably should have sought a writ at the appellate courts to force the judge to stay on the record. Quite frankly, I frequently felt like an outsider—there seemed to be a lot of camaraderie between the judge and trial counsel, and even with CPT Martin, all of whom seemed to identify strongly with Fort Bragg and the "Airborne" community.

I was also concerned about the atmosphere at Fort Bragg, and I strongly felt a change of venue was not just appropriate, but necessary for a fair trial. Fort Bragg was, in my opinion, a very "macho" post. There seemed to be a real feeling that the shootings were an attack on the entire "Airborne" family. This feeling was not just evidenced by personnel from the 82nd Airborne Division, but from anyone associated with the post. Everyone on the panel, it seemed, had served at Bragg multiple times, often in airborne assignments. From my perspective, the "Airborne" mentality permeated everything, even the trial. We litigated a change of venue motion, but it was denied. From then on I felt that we were definitely fighting an uphill battle, both as to findings and sentence.

From my limited knowledge about capital cases at the time, I did understand that it

was important for the defense to put on a case in mitigation, and that employing a mitigation expert was one of the most effective ways of preparing a mitigation case. I did not know at the time how crucial such assistance is in capital cases. In my current office in Kentucky, for example, a mitigation specialist is assigned to every capital case, without exception. Early on in the case, we felt the need for such expert assistance from a forensic social worker or someone else with similar experience. We felt in this particular case the assistance of such an expert was required because, as attorneys, we did not possess any requisite training or knowledge to conduct an extensive social history investigation for the extenuation and mitigation phase of a capital case. We felt we needed expert assistance to help us—and subsequently a court martial panel—understand why the offenses occurred and to place that information in the context of various legal, scientific, and social disciplines. Based on the limited knowledge I had, I believed that it was only if we could adequately explain why SGT Kreutzer committed these offenses that we had any hope of avoiding a death sentence.

I submitted a request for a mitigation expert to the military judge, which was denied. As far as I know, the motion for a mitigation expert submitted in March 1996 was the first attempt to secure such assistance. As a result of the military judge's denial of the funding for expert assistance, it was left to CPT Martin and me to do this massive and important work on our own, without any training or assistance from anyone with experience. Of course, we were required to take on this task in addition to the rest of the work of preparing ourselves and our client for a capital trial, a mere 90 days or so before the trial.

Without the benefit of any expert assistance, CPT Martin did most of the work in order to prepare what we considered to be a mitigation investigation. We decided to concentrate the investigation in three separate areas: 1) SGT Kreutzer's family and developmental history; 2) psychological and psychiatric information; and 3) his military ca-

reer. Our interviews with SGT Kreutzer and his family and development of his life history totaled approximately 20 hours during the period from December 1995 to June 1996. We also interviewed friends, teachers, and others mentioned by the Kreutzers. We probably did not focus enough attention on his mental health problems.

Our investigation into SGT Kreutzer's mental condition focused primarily on the examinations conducted by Dr. Diebold at Fort Bragg and Drs. Knorr and Lande at Walter Reed Army Medical Center (WRAMC). I do not recall investigating Drs. Knorr or Lande's qualifications, but accepted them as the proffered experts the government made available. My recollection is that the judge made the suggestion for the defense to utilize them in an 802 session, and it may have been more than a suggestion. In other words, it is quite possible that the judge told us they would be our experts and left us no other option. I recall that the judge made a telephone call in his chambers, with defense counsel and trial counsel present, to Dr. Lande and discussed the possibility of his participation in the case.

With regard to our discussions with these individuals, I believe we focused primarily on the issue of mental responsibility at the time of the offenses rather than discussing mental health issues as potential mitigation. I do not recall specifically what, if any, information or materials we provided to Drs. Knorr and Lande other than what they already had (such as copies of the article 32 investigation, the charge sheet, and SGT Kreutzer's medical records). I believe they did meet with several members of the Kreutzer family at WRAMC. At one point CPT Martin mentioned that a Dr. Rollins, whom SGT Kreutzer had privately retained, had done a preliminary examination on SGT Kreutzer. However, I do not recall seeing a report and I do not believe I ever spoke to Dr. Rollins.

Before we began working with the doctors at WRAMC, we did ask the military judge for funding for an independent mental health expert but that, too was denied. Though my recollection was that we asked for funding for Dr. Rollins, I am told that we asked for funding for Dr. David Marcotte, whom I

believe was recommended by Mark Waple, a local attorney. Dr. Rollins saw SGT Kreutzer before I became involved in the case. I recall speaking with CPT Martin about Dr. Rollins and his recommendations, including his recommendation that Kreutzer not make any significant decisions in the case until his depression was under control. We were then left with Dr. Diebold, who had done the sanity board, and the two doctors at WRAMC offered by the military judge.

Within the past few days I learned that the forensic psychiatrists at WRAMC, Drs. Lande and Knorr, had had SGT Kreutzer examined by Dr. (COL) Robert S. Brown. I was provided a copy of Dr. Brown's report (dated April 11, 1996) on February 3, 2002 by COL Odegard. I can unequivocally say that until then I had never heard of Dr. Brown, had no knowledge that he had examined my client SGT Kreutzer, and was unaware of Dr. Brown's conclusions regarding SGT Kreutzer's mental state on the date of the offenses. Had I known of Dr. Brown's examination, I believe I would certainly have discussed his conclusions with him, to determine whether Dr. Brown would be an effective witness for the defense at SGT Kreutzer's trial, either at the findings stage or in extenuation and mitigation. At a minimum, Dr. Brown's report would have been helpful to the defense team in developing a strategy for trial, whether or not we ultimately called him as a witness. I have no idea why Dr. Brown's report was not provided to me. After all, the forensic psychiatry program at WRAMC had been appointed to assist the defense in this case and SGT Kreutzer was sent to WRAMC in April 1996 to be evaluated by the doctors there in preparation for trial. Captain Martin and I met with Drs. Lande and Knorr at WRAMC, probably late in April 1996, to discuss their evaluation of SGT Kreutzer, and they did not mention Dr. Brown or his findings to us at all.

I knew that Dr. (CPT) Wendi Diamond, the 82nd Airborne Division psychiatrist, had spoken with SGT Kreutzer on the day of the offenses but I did not interview her. I had a copy of the transcript of her interview with SGT Kreutzer, and I believe I also may have listened to a tape of that interview. I knew that she was represented by an attorney, Mark Waple (the same attorney who was co-counsel on the case I was trying at Fort Sam Houston). I thought that CPT Martin had spoken to her attorney about interviewing her, and I believe I assumed that he would conduct the interview, as he was local at Fort Bragg.

I did not interview CPT Fong either, whom I believe was stationed in Korea during this pretrial period. I believe that CPT Martin had spoken with him by phone. We knew that CPT Fong was not a licensed psychologist.

I do not recall anything about a suicide attempt SGT Kreutzer made in February 1996, while in pre-trial confinement. I do not recall obtaining any reports from brig personnel, discussing SGT Kreutzer with any of the brig social workers, counselors, or chaplains, and or knowing at that time that an individual's adjustment to confinement can be powerful mitigating evidence in a capital case. Had I seen Dr. Brown's report, I would have known about SGT Kreutzer's history of depression and repeated suicidal thoughts and suicide rehearsals.

I do recall talking with SGT Kreutzer about a guilty plea, but I cannot recall whether the government had made a guilty plea offer. Early in the preparation phase CPT Martin was recommending a plea in exchange for a life sentence; SGT Kreutzer was still depressed and focused on wanting to die. I recall conversations with CPT Martin about getting SGT Kreutzer stabilized so he could take a more active role in making decisions in his own interest. In the spring of 1996 we discussed with the prosecutors an offer to plead guilty in exchange for a life sentence, but the prosecutors told us that the convening authority would not agree to such an offer. I do not remember whether we ever submitted a written offer to plead.

Our investigation into SGT Kreutzer's military background and career involved interviews with members of his unit and his chain of command and obtaining various documents from his military files. The interviews had a double purpose—both for during the merits phase and also during the penalty phase of

the trial. CPT Martin and I did travel to Maryland in late April 1996 and discussed the case with SGT Kreutzer's family. Captain Martin had made at least one previous trip to Maryland to conduct interviews and meet with the Kreutzer family. We discussed at trial whether to call SGT Kreutzer's father as a witness, but the father told us he would not testify. We knew that SGT Kreutzer's father was pending serious criminal charges at the time of the offenses but did not obtain any records pertaining to that. I recall preparing the family member witnesses for trial. I remember meeting with Mrs. Kreutzer at her hotel and going through questions with her.

In general, our penalty phase strategy was to portray SGT Kreutzer as a decent person from a good family, a good soldier, not criminally oriented, who had some mental health issues not resolved by the army. I do not recall specifically preparing for victim impact evidence, and while we did interview some victims of the shootings, I know we did not talk to any of the victims who testified in the sentencing phase of the trial.

In the merits phase of the trial we called Dr. Diebold as a witness. We were aware that he was reluctant to testify but felt that we had to put some mental health evidence on. We had not interviewed Dr. Diamond, and Dr. Lande's findings, as I recall, were not all favorable to SGT Kreutzer. In retrospect, Dr. Diebold was not an effective witness for the defense. I do not recall what information we provided him about SGT Kreutzer or his family.

I feel our lack of knowledge and experience in capital case litigation probably evidenced itself most strongly in the penalty phase of the trial. In retrospect, I believe that we did not have a grasp of the significance of SGT Kreutzer's mental health issues at the time of the offenses and how those issues would have been helpful in building a mitigation case. I believe now that this was a weakness in our defense of SGT Kreutzer, caused by our lack of experience in capital cases and exacerbated by the fact that we were denied a mitigation expert who likely

would have had the insight to recognize the importance of the mental health issues.

In summary, I believe now, in retrospect, that our representation of SGT Kreutzer was crippled from the start because we did not have the experience, the training, the resources, or the time to mount an effective defense in his case. Our problems were made much more difficult by the government's unwillingness to provide us with the experts we needed.

### AFFIDAVIT

The affiant, James Anthony Martin, after first being duly sworn, makes the following statement:

I represented SGT William J. Kreutzer, Jr., at Fort Bragg, North Carolina, from October 27, 1995 (the date of the offenses) through the announcement of sentence in June 1996 at his general court-martial. I was the first defense counsel to enter an appearance in SGT Kreutzer's case. My Senior Defense Counsel assisted me in the early stages of representation, but he did not enter an official appearance at any time that I can remember. I was responsible for the initial investigation and preparation for trial. Later, after two other attorneys were added to SGT Kreutzer's defense team, I was assigned to investigate and prepare the extenuation and mitigation phase of the trial. Ultimately, SGT Kreutzer was convicted in June 1996 of premeditated murder (one specification) and 18 specifications of attempted premeditated murder. He was sentenced to death.

I received my Bachelor of Science degree in 1984 from the State University of New York, College at Purchase, majoring in chemistry. From 1984 to 1988 I was an officer on active duty in the United States Marine Corps. I received an Honorable Discharge from the Marine Corps in the 1990–1991 time-frame at the rank of Captain. I attended Pace University School of Law, White Plains, New York during 1988–1992. I worked in law offices full time during law school and attended Pace's night program. I was assigned to Fort Bragg in late 1993 after completing airborne training at Fort Benning. I completed a quick tour at XVIII

Airborne Corps legal assistance (six months), and then was assigned as trial counsel for one year. As trial counsel I prosecuted courts martial, was trained and appointed as a Special Assistant United States Attorney, and advised various commands at Fort Bragg for one year. I deployed with an engineer brigade in support of Operation Uphold Democracy in the Republic of Haiti. I then requested transfer to a position as trial defense counsel at Fort Bragg. At the time of SGT Kreutzer's offense, I was assigned to the Trial Defense Service (TDS) office at XVIII Airborne Corps, and had been a defense counsel for six to eight months. I was on active duty for a little over three years (until September 1996), and then went into the active reserves. I am still a member of the active reserves. I am a Major, with duties as the Deputy Staff Judge Advocate for the United States Army Civil Affairs and Psychological Operations Command (Airborne), Troop Program Unit, at Fort Bragg. In the civilian sector I am an Assistant Federal Public Defender in the Eastern District of North Carolina. I am a federal employee, with a practice limited to representing indigent criminal defendants in federal court.

Prior to representing SGT Kreutzer, I had no experience with homicide cases, much less capital defense. When the offenses occurred, I was TDY at a training program away from Fort Bragg. Most of the TDS officers from Bragg were also at the program, as was LTC Peace, the Regional Defense Counsel. LTC Peace was involved in the decision to detail me to SGT Kreutzer's case. I left immediately to return back to Fort Bragg. I saw SGT Kreutzer at Fort Bragg before he was taken to Camp Lejeune for pretrial confinement. I remember that SGT Kreutzer had visible injuries to his face. He appeared very calm and quiet. I was struck by SGT Kreutzer's flat affect at the time. I went to the crime scene the morning after the offense. I was given a detailed tour by the Trial Counsel and various military police. By the time I returned to Fort Bragg from TDY, the autopsy on MAJ Badger, the only victim to die of wounds suffered during SGT Kreutzer's attack, had already been completed. This disappointed and bothered me. I wanted to be present at the autopsy to ensure accurate reporting of the victim's cause of death, and to observe the handling of forensic evidence.

I believe that one of the reasons I was detailed to the case was that I had a good performance record. During my first six months in TDS, I accrued about six acquittals during various courts martial. I did not attend a capital litigation course until after my assignment as SGT Kreutzer's counsel. I made it very clear from the beginning that I did not have the experience to handle SGT Kreutzer's case on my own, and I requested an experienced attorney to assist me. I specifically mentioned that the ideal lead defense attorney in this type of case would have the rank, at least, of LTC. I also suggested that lead counsel needed captial experience in either a military or civilian capacity. It was apparent immediately that this could be a capital case, and I wanted an attorney experienced in capital matters. Major Jim Gibson, from Fort Knox, was detailed. Jim was a very experienced criminal litigator with some homicide experience. He brought a sense of calm and direction to our team. Unfortunately, he had no capital litigation experience. Captain Steve Stokes was a defense counsel assigned to the 82nd Airborne Division. He volunteered to be a part of the defense team. He had less experience than MAJ Gibson. I do not know if he had more or less experience than me. I consider him an extremely strong, dedicated, effective defense attorney. He generally stayed in a supporting role. Additionally, I received informal assistance by talking with civilian attorneys in the local community who had worked on death penalty cases. I was apprehensive about my ability to adequately and effectively represent SGT Kreutzer from beginning to end. In hindsight, I was right to have been apprehensive. I was involved in a very serious capital case which required legal experience I simply did not have. Even today, after almost 10 years of legal practice, with 7 years of specialized criminal litigation experience, I feel that I am still not qualified to do more than second chair a capital case.

I felt then, and I feel to this day, that none of the attorneys assigned to defend SGT Kreutzer had experience adequate to the task.

After meeting SGT Kreutzer and walking the crime scene, I immediately recognized that I needed expert assistance in preparing a mitigation investigation, in anticipation of putting on a mitigation case at trial. We requested funding from the government for such expert assistance, first from the convening authority and then, after the referral, from the military judge. Both the convening authority and the military judge denied the request. Thereafter, even though I knew that mitigating evidence was critical, I had little guidance in assessing and articulating issues for SGT Kreutzer's case in mitigation. It fell to me to conduct whatever work I could to prepare a mitigation case.

I did most of the interviewing of family members and SGT Kreutzer's acquaintances and friends. I traveled to Maryland on more than one occasion to conduct interviews. Again, I had no prior capital experience, and limited experience in building a case in mitigation. I gathered a lot of information about SGT Kreutzer's past but cold not discern what was important and what was not. It was very difficult for me to discern what was important in SGT Kreutzer's social or family history. For example, I knew that at the time of the offenses SGT Kreutzer's father was pending criminal charges for a sex offense against a teenage girl. These offenses were allegedly more than 10 years old but had only recently come to light. SGT Kreutzer knew that his father was facing charges. While this fact was intuitively significant to me, I did not know how to exploit it to SGT Kreutzer's benefit. In hindsight, I feel it was extremely important and relevant to a mitigation case, and we failed to use it in any way.

I also knew that there were mental health issues. Sergeant Kreutzer paid for an evaluation by Dr. Rollins, a psychiatrist in North Carolina, with his own funds. Dr. Rollins and I visited SGT Kreutzer together for his forensic evaluation. Dr. Rollins sent me a report early in November 1995. Dr. Rollins did not spend as much time with SGT Kreutzer as he would have liked, and his findings were merely preliminary. I spoke with Dr. Rollins immediately after his evaluation of SGT Kreutzer, and again later by telephone. Dr. Rollins immediately told me that, in his opinion, an insanity defense would not be viable and that the attorneys should pour their main efforts into his case in mitigation. Despite this information, I did not pursue any further testing, nor did I follow up with him regarding use of this mitigating mental health evidence. Another reason that efforts stalled in this area was that SGT Kreutzer's money was exhausted. I spoke with SGT Kreutzer's parents to see if they could assist in funding. They stated that they could not assist him financially at that time. I contacted a private law firm interested in representing SGT Kreutzer. They offered to provide their services in return for SGT Kreutzer's agreement to give the firm the "rights" to his life story. That effort, however, failed.

We continued to seek funds to obtain another mental health expert. We still wanted to see if an insanity defense was at all viable. I do not remember why I requested government funding to retain Dr. David Marcotte in November 1995, after Dr. Rollins had already begun his assessment of SGT Kreutzer. In any case, the government denied our request for funding for a mental health expert, and I was left with the mental health experts (Drs. Knorr and Lande) that the government provided. These doctors evaluated SGT Kreutzer at Walter Reed Army Medical Center in April 1996, and met with MAJ Gibson and me to discuss their conclusions.

I did not then appreciate that SGT Kreutzer's mental health problems, which did not rise to the level of a complete defense, would, nevertheless, constitute significant evidence in mitigation. I do not remember that Drs. Lande and Knorr adequately explained to me how their findings could assist in presenting a mitigation case. Advanced legal representation is as much an art as a logical process. It requires years of training, followed by practical experience with hundreds, if not thousands, of criminal cases to become seasoned in this type of work. In my opinion,

due to the miniscule volume of capital cases in the armed services, it is impossible to maintain a bar of experienced capital litigators qualified for this challenging area of practice.

I did not, therefore, effectively develop a mitigation case based on the mental health evidence. I knew about the incident in the Sinai with CPT Fong and I knew about SGT Kreutzer's interview with Dr. Diamond on the day of the offenses, but I never interviewed either of these mental health professionals at any time prior to the trial. The government knew that Kreutzer had a history of mental problems. Sgt Kreutzer notified one of his senior NCO's just prior to his shooting spree, either a First Sergeant or Sergeant Major. This NCO was immediately transferred out of the unit and was unavailable during his Article 32 investigation. I think that the government's initial willingness to enter into a plea was based on its recognition that the chain of command failed to recognize the seriousness of Kreutzer's problems, and not on any perceived flaws in the government's proof. I remember discussing Dr. Diamond with MAJ Gibson, and it is my recollection that MAJ Gibson was responsible for interviewing her. I did not see a transcript of her interview with SGT Kreutzer and have never heard the tape. My recollection is that one of the other attorneys said that he had interviewed her and decided against using her testimony at the trial. Similarly, I believed that MAJ Gibson had interviewed CPT Fong, either telephonically or in person. I remember meeting CPT Fong the day of the trial. I believe that he was not called as a witness because we did not think his testimony regarding SGT Kreutzer would be mitigating. Some time after SGT Kreutzer's sentencing I spoke with a private attorney, Mark Waple about SGT Kreutzer's trial. Mark claims to have represented Dr. Diamond over some professional problems she had with the Army after SGT Kreutzer's case. Mark mentioned to me that, in his opinion, Dr. Diamond was a critical witness that may have prevented the levy of a death sentence in SGT Kreutzer's case. He could not discuss any details due to

his attorney-client relationship with her. Mark Waple was one of the few private attorneys that gave freely of his time and extensive knowledge to our defense effort. To this day I am extremely grateful for Mark's support.

Initially, I was uncertain about the impact of the 706 (sanity) board in preparing our case for trial, and unsure whether to advise SGT Kreutzer whether to cooperate with the board or to refuse to. My concern was that SGT Kreutzer's statements to the board might not be privileged. Finally, it was decided that SGT Kreutzer should cooperate with the sanity board, in order to keep the option of an insanity defense open. However, it is my recollection that the defense team provided few records, if any, to the board. I am not sure whether the board obtained records on their own. I never asked for any information, such as notes or test results, from the sanity board. The board opined that SGT Kreutzer was mentally responsible at the time of the offenses.

Both before and after the sanity board, it was very clear to me that the defense team needed extensive expert assistance on mental health. Drs. Lande and Knorr were provided after the military judge denied our request for expert funds. I cannot recall exactly how these persons were made available to the defense. It might have been in an R.C.M. 802 session in the judge's chambers, at which the judge and prosecutors (but not SGT Kreutzer) were present. We talked to one of these medical people on the phone in chambers during the session. From the beginning, the focus with respect to expert assistance was on the issues of competency and mental responsibility, and little was said about mitigation. I do not remember if we asked them to assist in developing mitigation information, nor do I remember if they volunteered any. I knew very little about Drs. Lande and Knorr. We had limited information about their backgrounds and professional experience, and I did not make any extensive inquiry. I have since been informed that Dr. Knorr was previously assigned as the psychiatrist for the 82nd Airborne Division. I do not remember that I knew of Dr. Lande's connection to the 82nd Airborne Di-

vision at the time of SGT Kreutzer's case. This, to me, clearly implies that Dr. Lande failed to inform us of this previous assignment and potential conflict of interest. So far as I recall, we did not provide either Dr. Lande or Dr. Knorr with any additional records in order to assist them in their evaluations.

Within the past few days I learned that the forensic psychiatrists at WRAMC, Drs. Lande and Knorr, had SGT Kreutzer examined by Dr. (COL) Robert S. Brown. This exam occurred during the time that SGT Kreutzer was at WRAMC for evaluation in preparation for trial. I was provided a copy of Dr. Brown's report (dated April 11, 1996) on February 5, 2002 by COL Odegard. Until COL Odegard told me about Dr. Brown's examination I had never heard of Dr. Brown, had no knowledge that he had examined my client SGT Kreutzer, and was unaware of Dr. Brown's conclusions regarding SGT Kreutzer's mental state on the date of the offenses. Had I known of Dr. Brown's examination, I would certainly have discussed his conclusions with him, to determine whether Dr. Brown would be an effective witness for the defense at SGT Kreutzer's trial, either at the findings stage or in extenuation and mitigation. At a minimum, Dr. Brown's report would have been helpful to the defense team in developing a strategy for trial, whether or not we ultimately called him as a witness. I do not know why Dr. Brown's examination was not discussed with me or why his report was not provided to me. It was my understanding that the forensic psychiatry program at WRAMC had been appointed to assist the defense in this case and SGT Kreutzer was sent to WRAMC in April 1996 to be evaluated by the doctors there in preparation for trial. MAJ Gibson and I met with Drs. Lande and Knorr, in April 1996, to discuss their evaluation of SGT Kreutzer, and they did not mention Dr. Brown or his findings to us at all. I also may have had a couple of telephone conversations with Dr. Knorr.

Once I knew, from Dr. Rollins' evaluation, that an insanity defense was likely unavailable, it became evident to me that we should try to enter into a plea agreement in exchange for a life sentence. MAJ Gibson agreed with me, and we both felt that we needed an expert in capital litigation who could talk to SGT Kreutzer about the advantages of a plea. The Government's trial counsel offered a plea within days of the shooting. The offer included a stipulated life sentence, with possibility of parole, in exchange for SGT Kreutzer's plea to some form of murder. I remember receiving a written plea agreement that we took to SGT Kreutzer for his consideration. Even the military judge seemed to be in favor of a plea—I recall him saying to me in informal conversation words to the effect that the case "needs to be settled". Unfortunately, we failed to convince SGT Kreutzer to accept the plea offer. During this time, in the fall and winter of 1995, he was in and out of depression and was suicidal. We had regular meetings with him, trying to get him to plead guilty. We utterly failed to convince him to sign the plea agreement. Our failure to get SGT Kreutzer to make a timely decision and accept the plea was of tragic proportions. We tried to get him on medication, but his cooperation with medication was "hot and cold." I do not remember him ever becoming stable. Eventually another prosecutor, MAJ Einwechter, was assigned SGT Kreutzer's case. At that point the plea offer was permanently taken off the table.

Once MAJ Gibson was on the defense team, late in 1995, we divided up responsibilities for SGT Kreutzer's defense. MAJ Gibson stated that he would do the sentencing argument, since he was the senior attorney. I recall that we talked about interviewing Diane Badger (MAJ Badger's wife). I do not remember talking to her. We were not aware that she tried to give a *Book of Mormon* to SGT Kreutzer or that the trial counsel instructed her not to talk to him until after her testimony. I interviewed many of the shooting victims before the trial. They were all extremely cooperative and professional. CPT Stokes and I were both at Fort Bragg, and I spoke with him regularly. CPT Stokes did a lot of the legal research in preparation for trial, but I cannot recall any details. MAJ Gibson was not stationed at Fort Bragg, and could not be as involved as

he needed to be. He had at least one other major case going on until the end of 1995. Also, his mother was very ill and died during this time frame. MAJ Gibson was a mature, experienced litigator that brought much to the team. However, MAJ Gibson's late appearance in the case, his limited availability, and lack of capital experience was very frustrating. We could have used additional support during preparation for trial.

As part of our requests for funding to the convening authority and military judge, we requested separate funds to hire a private investigator. We wanted, and deserved, an investigator with capital litigation experience, to assist in our pre-trial investigations. In response to this very reasonable request, we received a completely illogical, unreasonable and insulting response. An investigator from a military police company at Fort Bragg was assigned to assist us in our work. This investigator came from the very same military police unit that investigated and helped prosecute SGT Kreutzer's case! We, of course, could not use him much less trust him. He had zero experience with investigating capital cases. The assignment of this investigator was a humiliating, "slap-in-the face" to our defense team.

In retrospect, I think that it was a complete mistake to have SGT Kreutzer plead guilty to the lesser offenses. In doing so we forfeited the opportunity to have a detailed trial in which the mitigation evidence. In particular, the escalating pressures on SGT Kreutzer, who was known by his unit to have mental health problems and to have threatened violence in the past, could have been presented and discussed. Our thought was to rest on "honor, to show remorse and responsibility." This strategy might have worked for an ordinary felony case, but was very inappropriate for a premeditated murder case with the death sentence as a very probable outcome. I have no independent recollection of SGT Kreutzer's providence inquiry or our preparation for it.

We knew that we needed a mental health expert to testify. I do not recall why we decided to use Dr. Diebold in the merits phase of the trial. Perhaps we were trying to negate the issue of premeditation. In any event, it was a meager, awkward and unskilled effort to work in SGT Kreutzer's mental health problems. In my opinion it failed to be helpful. I do not recall ever meeting with Dr. Diebold or getting any records or notes from him. I also do not remember giving any information or records to him to help him prepare his testimony. I do not recall whether or not I received records from mental health professionals who had had contact with SGT Kreutzer at the Camp Lejeune brig. I knew that SGT Kreutzer had been diagnosed with various personality disorders (different disorders by different professionals). These personality disorders concerned us mostly when trying to prepare for the government's rebuttal at trial. I do recall, in dealing with the issue of Dr. Diebold's testimony, that we did not want to lose the sympathy of the members by seeming to use mental health problems as an excuse.

Our strategy for the penalty phase of the trial was developed very late in the case. We looked over what we had and did not have, and made various critical decisions. We chose witnesses whom we thought would cause the least damage. We initially planned on calling SGT Kreutzer's father, but minutes before testifying he became upset to the point of being uncontrollable and I decided not to call him to the stand. I remember meeting with the family members and going through things shortly before the trial. In short, we treated the penalty phase of this case the same as we would treat the extenuation and mitigation case in any court-martial. We did not spend enough time preparing witnesses. Part of that, to be sure, was because the extenuation and mitigation witnesses (at least the family members) were out of town. I did not perceive the importance of extensive interviews and preparation of these witnesses. It was a struggle to get the funding to do the travel required, and inadequate time was set aside for this effort.

My office at TDS was in the same building (at XVIII Airborne Corps) as the military judge's office. On a few occasions the military judge asked me into his office to talk informally with him about SGT Kreutzer's case. I do not recall the exact substance of

these conversations, but they mainly involved him asking me how the defense team was progressing in its preparation for trial and if we felt we would be ready to proceed with the litigation schedule established at that time. We had some R.C.M. 802 sessions (at which the government representative was present but SGT Kreutzer was not). At the time, I did not see a problem with 802 sessions, so long as the record stated what went on in the sessions. Now I know that, during capital litigation, it is poor practice to have a session in which there is no record for review, or to have a session in which the client is not present. There were many informal sessions, including some before referral, in which things related to the case were discussed with the judge and the prosecutors. It was in these early, informal talks that I got the strong impression that the judge wanted the case to move quickly and efficiently. It was my impression that the judge was completely comfortable with, and would accept, a plea in return for a life sentence. I did not approach the convening authority to try to obtain his agreement to a non-capital referral. MAJ Gibson did try and was not successful.

At the time of SGT Kreutzer's trial, I was only vaguely aware that an individual's adjustment to confinement is appropriate mitigating evidence in a capital case. I spoke with the mental health professionals at Camp Lejeune and read their reports. We had a dilemma. We were trying to get SGT Kreutzer appropriately medicated. However we were very concerned that SGT Kreutzer's statements to mental health professionals at the jail would not be privileged. For this reason we actually wanted to insulate SGT Kreutzer from questioning by mental health professionals. I did know that SGT Kreutzer was suicidal for much of the time he was in pretrial confinement. I spoke with the brig personnel about appropriate precautions, and also about medications. I was told by a social worker about SGT Kreutzer's attempt to hang himself with his boot laces. Dr. Rollins recommended that SGT Kreutzer be medicated. I recall seeing reports from Drs. Messer and Stone at the brig. We were

concerned that if we called either of them to testify we might have to turn over those reports to the government. Some of these reports contained information that we deemed damaging to the defense effort. In retrospect, I should have explored more thoroughly the issue of SGT Kreutzer's adjustment to confinement. I often spoke informally to SGT Kreutzer's guards, just to see how he was doing, but I did not realize that their impressions may have been of value to our case in mitigation. I do not recall talking to the brig chaplain, but I do recall that SGT Kreutzer told me that he had talked to a chaplain.

The peculiar culture at Fort Bragg was a tremendous influence in this case. The pervasive atmosphere at Fort Bragg was that soldiers with mental health problems should not seek mental health services. Soldiers with mental health problems need to "suck it up and drive on" and failure due to mental health falls into the area of "no excuses." This patent lack of sympathy and empathy, fostered at all levels of command, was particularly influential in steering us away from an insanity or diminished capacity defense. I honestly did not think that emotional or mental health problems would be accepted as mitigating by the court martial panel. We felt very, very restrained with regards to blaming the system or the command. In hindsight, we should have prepared this approach meticulously and then walked this avenue with both barrels blazing. It would have been easier to do this if the venue, panel members, and two defense counsel had not been at Fort Bragg.

In retrospect, SGT Kreutzer's defense team failed because we were grossly inexperienced and grossly underfunded for purposes of capital litigation. Further, we were denied the ability to choose highly qualified mental health experts that we felt comfortable with. We had the right to experts that were capital qualified, and sympathetic to SGT Kreutzer's cause. To top it off, we were completely denied the assistance of a mitigation specialist and an experienced investigator. The combined effect of these legal events was that of a calvary sabre slicing the hamstrings of a charging horse at

full gallop. Charger and rider crashed to the ground, never to rise and fight again. SGT Kreutzer's defense team was crippled by lack of experience and lack of resources. SGT Kreutzer never had the team that he needed, and we told our superiors that. I hoped that we could get sufficient assistance from the TDS network in the Army. Sadly, Army TDS had no institutional knowledge and experience with capital litigation. TDS also failed to look "outside of the box" for assistance with SGT Kreutzer's case. TDS was basically no help. Attendance at a two-day training program is absolutely no substitute for a seasoned criminal defender with capital litigation experience!! We tried very hard to implement the suggestions made at the training course, especially regarding the employment of experts. The government and the military judge both denied funding for those experts. Ironically, we were unable to put what little we had learned into effective practice.

### AFFIDAVIT

The affiant, Stephen Stokes, after first being duly sworn, makes the following statement:

I was one of the counsel on the Trial Defense Services (TDS) team who represented SGT William J. Kreutzer, Jr., at his court-martial in 1995 and 1996. Sergeant Kreutzer was sentenced to death in June, 1996. I left the Army in June, 1999 and am currently in private practice in Fayetteville, North Carolina.

I was not the first attorney detailed to the case. That was CPT Tony Martin. At the time the offenses I was assigned to the TDS office at the 82nd Airborne Division. I graduated from law school in 1991, entered the JAGC in 1992, and reported to Fort Bragg in the summer of 1994. When the offenses occurred, I was at a TDS conference in South Carolina. We received a call about what had happened. After some discussion among the TDS leadership present at the conference, CPT Martin was assigned to the case. Later MAJ Gibson was added, and I came in after that. I do not know the reason I was assigned, but I do note that I had been at TDS

for more than a year and that the leadership likely thought a third attorney was needed. I recall sitting in at the Article 32 hearing.

My role in SGT Kreutzer's defense was much more limited than the roles of the other two counsel. When I came in on the case there was some discussion among three counsel regarding division of responsibilities. I helped with a few motions, most significantly the venue motion, which I argued. I met SGT Kreutzer at Ft. Bragg on occasion, but I did not travel to Camp Lejeune to meet with him at the brig. My role was basically limited to the tasks that were assigned me by the other counsel. I did not have any capital experience and I had no training in capital case litigation. Once assigned to the case I was not given any additional training opportunities for capital case litigation.

All of us in the defense were sensitive to the atmosphere at Fort Bragg, and that was a reason why we wanted a change of venue or a panel not connected with the installation. We got neither. We were also concerned about the military aspect of the victim impact evidence, knowing that the victims would be marched into the courtroom. We discussed the atmosphere at Bragg regarding pressures not to seek mental health services. The judge, who had been Special Forces and had served in Vietnam, wanted to try the case at Fort Bragg. He moved the case along fairly fast.

What made the case complicated was the extent of the mental health issue, including the sanity board. I was not involved with the sanity board and knew nothing about Dr. Rollins, who was a psychiatrist retained by SGT Kreutzer early in the case. I was aware of defense requests for funding for experts of various kinds, but was not directly involved in that process so I have very little knowledge of specifics. I was not at all involved in anything regarding Dr. Lande or Dr. Knorr, and I recall no discussion regarding their findings, or whether to use them as witnesses at the trial. I know that Dr. Diebold had done the sanity board, and I probably saw that report. I remember talking in general terms with the other counsel regarding who we were going to use as a mental health witness, but I do not know why Dr.

Diebold was chosen. I was not aware of any mental health experts who had seen SGT Kreutzer at the Camp Lejeune brig, and I do not know whether SGT Kreutzer was ever examined that the brig. I never had any dealings with anyone from Camp Lejeune, and I do not remember any discussion about putting on any evidence about how SGT Kreutzer had adjusted to incarceration. I was not involved with any of the interviews of family members or others that were done in preparation for the sentencing case.

I remember knowing that Dr. Diamond was involved early in the case, but I do not know any details. I never saw any notes or transcript, and I never heard the tape of her interview with SGT Kreutzer. I remember that there were some issues regarding the fact that government agents observed the interview, but I recall no discussion between the defense counsel about whether Dr. Diamond should be interviewed or used as a witness, and I do not know whether the other attorneys discussed that.

I was aware that there was an officer who had seen SGT Kreutzer overseas, prior to the offenses, about mental health issues. There was some issue of whether he should have followed up with SGT Kreutzer. I did not talk to this officer, and thought that one or the other counsel did.

As I was assigned to the 82nd Airborne Division TDS office and CPT Martin was assigned to the XVIII Airborne Corps office, we had little day-to-day contact. Our offices were on opposite sides of post. I knew that CPT Martin was in contact with MAJ Gibson, generally by phone because MAJ Gibson was usually elsewhere, but I was not involved in those conversations.

Regarding the R.C.M. 802 sessions, I was aware that CPT Martin had been involved in some informal discussions with the military judge, but since I was across the installation at another office, I was generally not involved. It was not unusual for Judge Brownback to have 802 sessions. I am not sure that everything that should have been on the record was on the record in SGT Kreutzer's case.

I am not aware of any offers by the government regarding a plea agreement. I recall only that we tried to offer a plea agreement, probably in March 1996, which the government rejected.

In sum, I believe that the key issue in this case was the defense's asserted need for expert assistance, particularly for a mitigation expert, which was denied by the government. Without this expertise, and without the funding necessary for expert assistance, we were unable to do the type of job in representing SGT Kreutzer that was required.